Joseph Creash, Arthur Loff, Al Brown, Fred Conroy, Jack Preist, and Joe Brewer, v. State

179 So. 149.
Opinion Filed February 2, 1938.

112

*Zewadski & Pierce,* for Plaintiffs in Error.

*Cary D. Landis,* Attorney General, and *Tyrus A. Norwood,* Assistant Attorney General, for the State.

TERRELL, J.—Plaintiffs in error were tried and convicted in the Criminal Court of Record for Hillsborough County on an information charging them with keeping and operating a gambling house contrary to Section 5499, Revised General Statutes of 1920, Section 7657, Compiled General Laws of 1927, as follows:

"Whoever by himself, his servant, clerk or agent, or in any other manner has, keeps, exercises, or maintains a gaming table or room, or gaming implements or apparatus, or house, booth, tent, shelter or other place for the purpose of gaming or gambling, or in any place of which he may directly or indirectly have charge, control, or manage-

ment, either exclusively or with others, procures, suffers, or permits any person to play for money or other valuable thing at any game whatever, whether heretofore prohibited or not, shall be punished by imprisonment in the State prison not exceeding three years, or by fine not exceeding five thousand dollars."

The defendants, Joseph Creash and Arthur Looff, were adjudged guilty and sentenced to pay a fine of fifty dollars each with costs of Court or in default thereof to be confined in the county jail at hard labor for a period of sixty days. The defendants, Al Brown, Fred Conroy, Jack Preist, and Joe Brewer, were adjudged guilty and sentenced to pay a fine of $12.50 and costs of court or in default thereof to be confined in the county jail at hard labor for a period of thirty days. They seek relief from the judgment so imposed by writ of error.

The question of whether or not defendants were guilty of the charge lodged against them turns on that of whether or not they owned or operated a room or house in which gaming or gambling was carried on. The statutes of this state do not attempt to define gambling or to point out all games and devices that constitute gambling. This court did, however, venture a definition of the term in McBride v. State, 39 Fla. 442, 22 So. 711, as follows:

" 'Gaming is an agreement between two or more, to risk money on a contest of chance of any kind, where one must be loser, and the other gainer.' A most apt definition of gambling, adopted by Anderson, in his Law Dictionary, is by Judge Thompson, in Brua's Appeal, 55 Pa. St. 294, text 298, as follows: 'Anything which induces men to risk their money or property without any other hope of return than to get for nothing any given amount from another, is gambling, and demoralizing to the community, no matter

by what name it may be called. It is the same, whether the promise be to pay on the color of a card, or the fleetness of a horse, and the same numerals indicate how much is lost and won in either case, and the losing party has received just as much for the money parted with in the one case as in the other, viz.: nothing at all.' "

To constitute gambling, it is immaterial by what name it is called if the elements of gambling are present and it is condemned by statute in nothing more than the use of the generic term. It is charged here that Plaintiffs in error kept a house in which "bingo" was played. The first question posited stated generally how it was played and is as follows:

"Where the operator of a game posts a prize in a fixed amount prior to the beginning of each game, and each contestant pays a small entrance fee to the operator for the privilege of participating therein, although the operator does not himself anticipate and stands no chance to gain back any part of the prize which he offers but on the contrary such prize in its entirety is certain to be paid out to the winning contestant regardless of the number of contestants, and all entrance fees are paid into a common fund of the operator out of which is paid all operating expenses of the establishment, including salaries, current expenses, license taxes for operating the game, advertisements, etc., as well as the prizes themselves, and such games are run off at regular time intervals, and a substantial amount of skill is involved in the playing of the game by the contestants—is such game so operated as aforesaid, a violation of the gaming laws of Florida?"

A fair epitome of the evidence with reference to the manner of playing and the apparatus used in the conduct of "bingo" shows that the management of the house offers a

prize to the winner which is announced before the beginning of each game. Each player pays an entrance fee of ten cents which entitles him to participate in the game. On entering the game he selects a card containing twenty-four different numbers ranging from 1 to 75, arranged in rows of five across the card up and down and diagonally, the center being blank and the numbers on each card being arranged differently. Neither the management nor its employees participate in the game. To play the game, a box or hopper divided into seventy-five square wooden slots arranged in five rows of fifteen slots each numbered consecutively from 1 to 75 is provided. A small baseball is furnished each player. These baseballs are thrown one by one beginning with the first player, each player throwing one ball alternately unless the game is earlier concluded in which event the next player begins the following game and the rotation is continued. As each ball is thrown in the box and lands in a slot, the management calls out the number of that particular slot and all players having the corresponding number on their card place a bean over that number. The first player who has five numbers covered by beans in a row, either horizontally, perpendicularly, or diagonally from the corners is the winner. When this occurs, the player calls "bingo." He is checked by the management and if found true, he is declared the winner and the corresponding prize awarded him.

All the games are run strictly on schedule but the prizes vary. There are three five-dollar games, then a ten-dollar game, then four five-dollar games, then a fifteen-dollar game, and then a ten-dollar game, when the schedule is completed and a new one is begun. The prizes are not in cash but orders for merchandise upon Tampa merchants selected by the winner. The schedule of prizes and games are run

at regular intervals regardless of the number of players and entrance fees paid.

The management has a bank account from which all prizes, general operating expenses of the establishment, including license fees, and overhead costs are paid. All entrance fees go into this account but the amount or value of the prize offered is always in the bank account before any entrance fees are paid and the prize is in no sense determined by the number of such fees paid. It is shown that both the hope of winning a prize and amusement induce the playing. It is also shown that the prospect of winning depends to some extent on the skill in selecting the cards and in throwing the balls.

Does such a state of facts about which there is no dispute constitute gaming or gambling as defined by the law of this State? Plaintiffs in error contend that this question must be answered in the negative, that the facts show nothing more than a contest for a "purse, prize, or premium" as distinguished from a "stake, bet or wager" which is essential to constitute gambling, that a contest for a "purse, prize, or premium" is not gambling but is essentially a game of skill because of the element of skill involved in the result. Johns v. Smith, 77 Fla. 398, 81 So. 514; Pompano Horse Club v. State, 93 Fla. 415, 111 So. 801; Reinmiller v. State, 93 Fla. 462, 111 So. 633; are relied on to support this contention.

It is quite true that in these cases we defined a "purse, prize, or premium" as something of value offered for the winner of a contest but for which the one offering it does not compete annd stands no chance to recover any part of it. We also held that a "purse, prize, or premium" was different from a "stake, bet, or wager" as to which each party

interested has a chance to win and takes the risk of losing the whole or some material part of it.

We do not understand, however, that the question of gambling or one's guilt who is charged with operating a gambling house is concluded by the question of whether the thing contested for was a "purse, prize, or premium" or a "stake, bet or wager." In Johns v. Smith, *supra,* we held that the thing involved was a "purse, prize, or premium," and wholly different from a "stake, bet, or wager," such as was involved in Pompano Horse Club v. State and Reinmiller v. State, *supra.* In the two latter cases involving charges of pari mutuel betting, we held that the thing contested for was a "stake, bet, or wager" in violation of Section 5514, Compiled General Laws of 1927. Pari mutuel betting was later legalized, Chapter 15832, Acts of 1931, so the decision on that point would now be to the contrary of the latter pronouncement.

Chance actuated by the hope of getting something for nothing is the controlling element in gambling. Any agreement or inducement by which one person risks his money or other thing of value with no prospect of return except to get for nothing the money or goods of another is gambling. If the contest for a "purse, prize, or premium" or a "stake, bet or wager" has this element in it, it is gambling regardless of the name by which it is called, the implements employed to accomplish the act or the manner in which it is conducted.

In gamblers' lingo "stake, bet or wager" are synonymous and refer to the money or other thing of value put up by the parties thereto with the understanding that one or the other gets the whole for nothing but on the turn of a card, the result of a race, or some trick of magic. A "purse,

prize, or premium" has a broader significance. If offered by one (who in no way competes for it) to the successful contestant in a feat of mental or physical skill, it is not generally condemned as gambling while if contested for in a game of cards or other game of chance, it is so considered. Section 7666, Compiled General Laws of 1927. It is also banned as gambling if created as in this case by paying admissions to the game, purchasing certificates or otherwise contributing to a fund from which the "purse, prize, or premium" contested for is paid and wherein the winner gains and the other contestants lose all.

It would serve no useful purpose to enlarge on these illustrations. The facts would in any given case determine whether a contest for a "purse, prize, or premium" was gambling or not. The statute does not attempt to enumerate all forms of gambling. It condemns some forms and legalizes others. Gambling, like many other practices in modern life, has had its evolution and in no field has the wit of man been shrewder, but the Courts have generally held that if the elements constituting gambling are present, the name by which called will not defeat the penalty. See Lee v. City of Miami, 121 Fla. 93, 163 So. 486, where we distinguished lotteries as a species of gambling.

To convict one of operating a gambling house, the ownership or control of the house must be proven and then it must be proven that by the owner's knowledge and consent or direction some game or device condemned as gambling has been habitually played or carried on there. Sections 7666 and 7669, Compiled General Laws of 1927, Sections 5508 and 5611, Revised General Statutes of 1920, enumerated certain games and devices which are condemned as gambling but "bingo" is not included in the list. Since the charge with which we are concerned is operating a gam-

bling house, these statutes are helpful only as they point to the character of game or device necessary to be played to constitute the place a gambling house.

The very act under which the information was cast would seem to be conclusive on this point. If the evidence which is not disputed shows that defendant operated a house or room in which they permitted "any person to play for money or other valuable thing at any game whatever, whether heretofore prohibited or not" they are guilty of the charge. In other words, if "bingo" was being played in the house for money or other valuable thing the fact that the prizes were paid for from the bank account of defendants from which all other operating expenses were paid, that they were paid in merchandise, that the game was played with balls, beans, and cards, each player selecting his card, that the games were played in series, that an element of pleasure entered into the playing, and that the management does not participate is not material.

Neither was it material whether the thing played for was a "purse, prize, or premium" or a "stake, bet or wager" if the jury were convinced from the evidence that the amount paid by each player to enter the game went into the common fund from which the prizes were paid that the primary purpose for entering the game was to play for money or something of value, that the prize or prizes played for were won and paid to the winner and the other players lost all they paid in it was warranted in returning a verdict of guilty.

The second question challenges the legality of the arrest of defendants, the seizure of their property as an incident thereto and later at the trial introducing such property as evidence against them.

The evidence discloses that the officers who made the

arrests and seizure complained of went to the place of defendants on the night of April 3, 1937, and played "bingo" with others for about two hours. They then concluded that playing "bingo" constituted a felony and having been committed in their presence forthwith arrested without warrant some twenty or twenty-five persons, six of whom were defendants.

After considering the evidence and argument of counsel challenging the arrest and seizure, the trial court ruled that under Section 8323, Compiled General Laws of 1927, and the decision of this Court in Dixon v. State, 101 Fla. 840, 132 So. 684, the arrest and seizure were legal. Section 8323, *supra*, authorizes sheriffs, marshals, and other police officers to arrest without warrant one committing felony in his presence. Operating a gambling house with which defendants were charged is a felony so we find no error in the trial judge's ruling on this point.

It is also complained that the arresting officers exhibited inordinate prejudice against defendants in that they permitted other "bingo" places to go unmolested and to run wide open at the time they arrested defendants in this case. Whether true or not, the record does not disclose but if it did, it would not be material to this case. If such favoritism exists, the polls rather than the Court would be the proper forum to correct it.

Other questions argued have been considered but in our view, such of them as are material are comprehended in and are answered by what we have said in this opinion.

Affirmed.

ELLIS, C. J., and WHITFIELD, BROWN, and CHAPMAN, J. J., concur.

BUFORD, J., concurs specially.

BUFORD, J. (concurring specially).—We know that it is somewhat difficult in this day and time of liberal mindedness for the average well informed individual to become reconciled to the thought and holding that a comparatively harmless game such as is involved in this case is denounced as gambling. The game known as "bingo" has become very popular among all classes of people and is played in the most exclusive and reputable places.

An article appearing in the issue of January 1st, 1938, of Literary Digest reads in part:

"A sign in front of a New York church reads: 'Bingo every Thursday night in the Holy Spirit Room.' On a rural Arkansas church a poster proclaims: 'Bingo party every week—Everybody welcome.' Encircled in neon lights another outside a Chicago suburban church announces: 'Don't miss Bingo Friday. Handsome prizes.'

"Attracted by such extra-spiritual heralds, thousands of Americans sit down in church weekly to try their luck in this national craze. In some localities the Tuesday or Thursday game at the corner church-house overshadows all other events.

"A survey made by the Literary Digest shows that the playing of Bingo is spreading rapidly throughout the United States. Neighborhood merchants have begun to complain of competition. Movie exhibitors are protesting. Some church leaders take a definite stand against the game.

"Last week religious editors and others admitted freely that discussion of the moral issue had reached controversial proportions. Phillip Yarrow, chairman of the civic relations commission of the Chicago Church Federation, expresses this opinion to the Literary Digest:

" 'The commission has repeatedly pleaded with churches to stop petty gambling as a means of raising money.

Churches a few years ago would have been horrified at the mere suggestion of such methods as playing bunco, beano, or bingo, and raffling quilts or other articles. The argument of some church officials is that, if wealthy churches can raise money by bridge, why should not the smaller one play beano? We say the kingdom of God cannot be established by shooting craps.'

"Typical of church sentiment in favor of bingo is this view of the Rev. H. A. Velte, of Milwaukee's St. Boniface Church, despite Archbishop Stritch's ban:

" 'How absurd to think that it is wrong when parents and their children sit down to a game that costs them a little 35 cents for the sake of a thrill that comes to them when seeing themselves or their friends win a prize. Of course, this innocent game can be carried to extremes.' ·

"The Rev. Francis Talbot, S. J., editor of America, sends this comment to the Literary Digest:

" 'I cannot grow frenzied with the puritanic precisionists who rate the bourgeois pastime of bingo as a major sin. Rather am I frenzied at those pulpiteers who remain silent on such major ills as godless schools, loose faith, easy divorce, and shout down wrath on a little shell game that ruins neither piety nor morals, character nor families. Played under proper auspices with petty stakes, the worst harm that bingo causes is a sore throat. Church bingo parties are a healthy substitute for gossip teas, lovesick movies, and liberal-minded lecturers. All life is a gamble but nobody gambles life away at a bingo fest. Let us concentrate on the stock market and politics.'

"Beano and bingo, with their allure, swift turnover, and simplicity of operation—placing beans or corn on five squares in a straight line and shout 'Beano' or 'Bingo'! had a way of stimulating gambling instincts. The Inter-

national Reform Federation (Washington, D. C.) investigated.

"Its law enforcement director, Henry N. Pringle, said he found that practically all churches had gone in for bingo and such games, with professional promoters running many of them. He added: 'The percentage which churches will get out of the intake varies with the value of the prizes. In some cases trinkets worth only a few cents constitute prizes; in others cash prizes are given. The churches probably get 50 per cent of the take.'

"In December, 1936, Bishop Edmund F. Gibbons, of Albany, in an archiepiscopal letter, forbade the playing of bingo in church buildings and the renting of church property for bingo game, and forbade Catholics in his diocese to play even on non-church property, on the ground that bingo tended to undermine morals.

"Archbishop Stritch of Milwaukee took the stand that sometimes such games were sinful or the places in which they were played tended to encourage sin.

"Archbishop John J. Glennon of St. Louis, writing to the churches of his diocese last month said: 'Gambling devices and games promoted ostensibly for the benefit of churches, schools, institutions or societies are unworthy of our Catholic people, inducing the gambling habit.'

"In New York the Federal Council of the Churches of Christ in America and the Greater New York Federation of Churches condemned bingo, but they reported that playing in churches in their group had not yet reached an issue stage.

"In Chicago Bishop Ernest Lynn Waldorf, head of the Methodist Episcopal Church there, told the Literary Digest: 'We deprecate the use of gambling devices and practices of any kind to raise church finances.' "

So we see that there is much conflict of opinion between the best of people as to the moral status of the game.

Operating a gambling house is a statutory offense and is defined very clearly by the language used in Section 5499 R. G. S., 7657 C. G. L., quoted in full in the main opinion prepared by Mr. Justice Terrell.

In the case of McBride v. State, 39 Fla. 442, 22 Sou. 711, gaming was defined as follows:

"A most apt definition of gambling, adopted by Anderson in his Law Dictionary, is by Judge Thompson, in Brua's Appeal, 55 Pa. St. 294, text 298, as follows: 'Anything which induces men to risk their money or property without any other hope of return than to get for nothing any given amount from another, is gambling and demoralizing to the community, no matter by what name it may be called. It is the same whether the promise be to pay on the color of a card, or the fleetness of a horse, and the same numerals indicate how much is lost and won in either case, and the losing party has received just as much for the money parted with in the one case as in the other, *viz.*: nothing at all.'

"Bishop in the second edition of his work on Statutory Crimes, Sec. 858, says that, 'In general, subject possibly to a few exceptions, yet not many, the words gaming and gambling in our statutes are similar in meaning; and either one comprehends the idea, that, by a bet, by chance, by some exercise of skill, or by the transpiring of some event unknown until it occurs, something of value is, as the conclusion of promises agreed, to be transferred from a loser to a winner, without which latter element there is no gaming or gambling.' The concensus of the better opinions is, that the wagering, betting or laying of money or other thing of value upon the transpiring of any event whatsoever,

whether it be upon the result of a game of chance, or upon a contest of skill, strength, speed or endurance whereby one party gains and the other loses something for nothing, whether the parties betting be the actors in the event upon which their wager is laid or not, is gaming or gambling within the meaning of these Acts."

So it appears that the statute prohibiting the operating of a gaming house is broad enough to include any enclosed or covered place where any persons are allowed to participate in any game or contest in which a player wins or is awarded anything of value upon a certain result being obtained and this is true although the playing of game might not necessarily constitute gambling. Playing the game "bingo" as described in the record does not come within the definition of gambling as stated in the McBride case, *supra,* because while each player pays a small fee for the privilege of participating in the game he parts with that when he pays it and it goes to the house. The prize is no loss to the house and its purpose is to stimulate the interest of the public in the game just as "Bank Nite" is used to stimulate patronage of picture shows. The players may be presumed to get the value of the fee in the pleasure and recreation afforded by participating in the game.

So it appears that a case is not made wherein one or more parties lose and one or more win, because of the lack of the element of loss.

We are not called upon to determine in this case whether or not the players in the game of "Bingo" are gambling, but only whether or not the defendants were guilty of operating a place where a game was conducted in which the winner was awarded a prize of something of value.