State ex rel. Trampe, Respondent, vs. Multerer and others, Defendants: Zrimsek and another, Appellants.

*December 8, 1939—March 12, 1940.*

*Max Raskin* and *William F. Quick,* both of Milwaukee, for the appellants.

For the respondent there were briefs by *Benjamin J. Miller,* and oral argument by *Mr. Miller* and *Mr. George J. Laikin,* both of Milwaukee.

The following opinion was filed January 16, 1940:

NELSON, J. The facts are not in dispute. The defendants, Edward F. Zrimsek and Marie Zrimsek, his wife, hereinafter called the "defendants," are the owners of certain premises on West North avenue in the city of Milwaukee. The defendant, Edward F. Zrimsek, operates a tavern on the ground floor thereof. On the second floor is a large hall which for about a year prior to the commencement of the action was leased four or five nights each week and at least two afternoons each week to Auxiliary to Sons of Union Veterans, and St. Victoria Society, patriotic and charitable organizations. For about a year prior to the commencement of the action, those two societies had conducted games of bingo in the large hall, the proceeds of which were turned over to the patriotic or charitable objectives of those organizations. Bingo was played in the following manner: Every person who desired to play was required to pay an admission price upon entering the hall where the game was played. He was given a card, rectangular in shape, divided into twenty-five squares, each of which contained a number. The squares were arranged in vertical and horizontal columns containing five squares. The cards so distributed had different combinations of numbers on them. Numbers corresponding to the numbers on the various cards were placed in a container or drum, which was kept in a conspicuous place. The container

was revolved until a number was caught upon a device designed for the random selection of a number. That number was removed from the container and called out to the players. Each of the players having this number upon his card placed a kernel of corn upon the square containing it. When a row of numbers on a card was completely filled out with kernels of corn (either vertically, horizontally, or diagonally) the player called out "bingo." His card was then checked by an attendant and if found to be correct he was declared the winner of that game. He was entitled to the prize that had been announced just prior to the commencement of that particular game. The price of admission was either twenty-five or thirty-five cents, depending upon the day when the game was played and the organization sponsoring the game. The admission price entitled a patron to a bingo card which gave him the opportunity to play a fixed number of games. Additional bingo cards might be purchased at five and ten cents each, so that a player might play as many cards as he desired. As many as ten cards were often played by patrons. No one could play who had not paid the admission price. The prizes, according to the evidence, varied from $2.50 to $165 per game. To the winner a certificate was given which was payable at the bar of the tavern. Ordinarily the winners made purchases at the bar although it was not necessary to do so. If two or more players, on the calling out of a certain number, filled out a row on their cards, the prize was divided and certificates issued to them for a proportional part of the prize. In addition to the chance to win at bingo, a door prize amounting to $1 was given away at each afternoon or evening session. That prize was awarded by lot. The testimony showed that at times there were as many as one thousand people playing. One of the lady managers testified that "we must have seven hundred." The defendant, Edward F. Zrimsek, testified that something like $1,600 to $2,000 was paid out by him each week in redeem-

ing prize certificates. Children were not permitted to purchase admission tickets but were admitted if accompanied by their parents and were permitted to play bingo in case their parents purchased cards for them. Conspicuous signs advertising that "bingo" was played there, and that the public was invited to play, were displayed in the ground-floor windows of the premises. The organizations, from time to time, redeemed or repaid to the defendant, Edward F. Zrimsek, the amounts paid out by him to redeem the prize certificates.

Upon the opening of the trial and the swearing of a witness, the defendant interposed a demurrer *ore tenus,* asserting that the complaint did not state a cause of action. The court took the motion under advisement, and pending its decision thereon, permitted the trial to proceed. Later on, the motion was denied. The defendants contend that their motion should have been granted and that the court erred in denying it. While the complaint might have been somewhat more specific in its allegations, we think it sufficiently charged that bingo was gambling; that the game of bingo had been conducted upon the premises for a considerable period of time; that the premises constituted a gambling resort and was a public nuisance. In our opinion, no error was committed by the trial court in overruling the demurrer *ore tenus.*

The defendants next contend that bingo was not gambling as it was played upon the defendants' premises and was not prohibited by the statutes of this state. Secs. 348.07, 348.09, and 348.11, Stats. This contention is grounded upon the fact that the games were conducted for the purpose of raising funds for charitable and patriotic purposes, and, therefore, there was lacking in them any element of private gain. It is asserted that our statutes prohibiting gambling were never intended to interfere with or outlaw the custom of raising funds in that manner, by religious, charitable, social, or political organizations. It is conceded by the defend-

ants that the term "gamble" is sufficiently broad to embrace the game of bingo if played for money or prizes and for purposes other than those of raising money for charitable or patriotic purposes.

We have no doubt that bingo, as played for about a year upon the defendants' premises, was a gambling game and was a lottery. In the very recent case of *State ex rel. Cowie v. La Crosse Theaters Co.* 232 Wis. 153, 158, 161, 162, 286 N. W. 707, it was held that "Bank Night," as it was alleged to have been operated, constituted a lottery. . It was there said that "a lottery involves three elements. There must be a prize, chance, and a consideration." What was said there was in accord with the universal holdings of the courts. In the playing of bingo there obviously was a consideration. The admission price included one bingo card. Other cards could be purchased and were often purchased by patrons who desired to play more than one card. Playing, of course, involved a chance. Only a small percentage of the patrons won a prize and all of the others lost their money. There were prizes ranging from $2.50 to $165. The total prizes amounted to $1,600 to $2,000 each week. Clearly, bingo as played upon the premises was a lottery, and was played, in violation of the statutes of this state. Sec. 348.01, Stats. Sec. 24, art. IV, of our constitution provides:

"The legislature shall never authorize any lottery. . . ." That is a strong declaration of the public policy of this state. Similar games have been considered by other courts. Such courts have all held that such games when played for prizes are gambling. In *People v. Welch,* 269 Mich. 449, 257 N. W. 859, a game called "beano" was considered. It was held to be a lottery. In *United-Detroit Theaters Corp. v. Colonial Theatrical Enterprise, Inc.,* 280 Mich. 425, 273 N. W. 756, a similar game called "screeno" was considered and held to be a lottery. *Creash v. State,* 131 Fla. 111, 179 So. 149, was a criminal prosecution in which a game called

"bingo" was considered, which also involved a slight element of skill. *People v. Babdaty,* 139 Cal. App. Supp. 791, 30 Pac. (2d) 634, involved a similar game called "tango."

The contention that bingo when conducted for the purpose of raising funds for charitable or patriotic purposes is not gambling and that such a game, when so played, was never intended to be within the prohibition of the constitution or the statutes, needs little discussion because so obviously without merit. No exception of that nature is found either in the constitution or the statutes.

In *Seattle v. Chin Let,* 19 Wash. 38, 40, 52 Pac. 324, the defendant there was charged with violating a city ordinance which prohibited lotteries. The defendant contended that the ordinance was invalid because in conflict with a statute which exempted "lotteries for charitable purposes." The court held that the exception contained in the statute was unconstitutional because in conflict with the state constitution which provided that "the legislature shall never authorize any lottery." The court said:

"The language of the constitution is mandatory and the provision is self-executing. The question naturally suggests itself, if lotteries for charitable purposes may be lawfully conducted and permitted, why may not lotteries for any other purpose? We think that the constitutional provision admits of no exception in favor of lotteries for charitable purposes or for any other purpose."

In *Adams v. Antonio* (Tex. Civ. App.), 88 S. W. (2d) 503, 506, it was contended that the machines there involved should not be held to be gambling devices prohibited by law but rather lawful coin-vending machines, because they were subject to a tax and the revenues received as taxes were badly needed by the state. The court rejected that contention and said:

"It may be conceded that as a result of the recent depression the government is badly in need of revenue, but it is sufficient to say that we have not yet reached the stage where

the state is granting concessions to individuals to violate the law in return for revenue with which to support the government."

In *Gimbel v. Peabody,* 114 N. J. Law, 574, 178 Atl. 62, it was held that a statute which purported to authorize dog racing under the pari-mutuel system, and which apparently was enacted to relieve a financial emergency created by the depression, and to provide funds needed by the state, was unconstitutional because violative of art. IV, sec. VII, subd. 2, N. J. S. A. Const., which prohibited the legislature from authorizing a lottery, pool selling, bookmaking, or gambling of any kind.

If a state or its municipalities may not be authorized by its legislature to conduct gambling and lotteries for their benefit, it seems clear that religious or charitable organizations could not be so authorized, in the face of a constitutional provision like ours.

The defendants further contend that the playing of bingo upon the premises, as it was continuously played for about a year, did not constitute a public nuisance. A similar contention was made in the *La Crosse Theaters Co. Case, supra.* It was there said that "every place where a public statute is openly, publicly, repeatedly, continuously, persistently, and intentionally violated, is a public nuisance." (Citing cases.) It was there held that the maintenance of a lottery is a violation of the public policy of this state as declared by its constitution and its criminal statutes. In view of the exhaustive consideration so recently given to a like contention, we see no point in further discussing the matter, which could be nothing more than a repetition of all or a part of what was said there. Under the rule of the *Bank Night Case* we have no doubt that the game of bingo, as conducted for over a year in the defendants' premises, was a lottery and was properly found by the trial court to be a public nuisance.

The defendants finally contend that the plaintiff had an adequate remedy at law by instituting criminal prosecutions

and therefore equity should not have been invoked. A similar contention was fully considered in the *La Crosse Theaters Co. Case, supra.* It was there said (pp. 161, 162) :

"The proposition as to the power of equity to abate public nuisances is stated in 5 Pomeroy, Eq. Jur. (2d ed.) § 1893, where it is said : 'Wherever a public nuisance is shown, equity must enjoin it at the suit of the government. Every place where a public statute is openly, publicly, repeatedly, continuously, persistently, and intentionally violated, is a public nuisance.' "

It further said :

"While most of the cases supporting abatement of public nuisances involve acts declared such nuisances by statute, abatability as a nuisance does not depend on statutory declaration, but abatement lies if the thing in absence of a statutory declaration is in fact a public nuisance."

And again :

"It is the fact of being a public nuisance that invokes and supports the remedy by abatement."

The holding in that case is in accord with the holdings of many courts throughout the country as appears from the cases cited in the opinion and also the following cases : *State ex rel. Bailes v. Guardian Realty Co.* (1939) 237 Ala. 201, 186 So. 168; *Garvey v. McNulty,* 270 Mass. 260, 170 N. E. 58; *State ex rel. Dawson v. Anthony Fair Asso.* 89 Kan. 238, 131 Pac. 626; *State ex rel. Igoe v. Joynt,* 341 Mo. 788, 110 S. W. (2d) 737.

We therefore conclude that the game of bingo, as played upon the defendants' premises, was gambling; that continuously playing and permitting it to be played upon the defendants' premises for about a year, constituted a public nuisance, and that the abatement of such games as a public nuisance was authorized by ch. 280, Stats.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, with $25 costs, on March 12, 1940.