STATE OF IOWA, appellant, v. WILSON E. MABREY, appellee.

No. 48211.

(Reported in 56 N.W.2d 888)

FEBRUARY 10, 1953.

Robert L. Larson, Attorney General, Earle S. Smith, Assistant Attorney General, and Matt Walsh, County Attorney, for appellant.

John Peters, of Council Bluffs, for appellee.

MULRONEY, J.—Defendant was informed against by the county attorney for keeping a gambling house in that he "did keep a place known as the 'Carter Lake Club', resorted to for the purpose of gambling, and did permit persons in said place to play at a game for money, known as 'Bingo', all in violation of section 726.1 of the 1950 Code of Iowa."

There was no dispute in the evidence. The sheriff and his deputy were the State's two witnesses. They told of going to the Carter Lake Club about 8:30 on the evening of June 21, 1952. The building has a small lobby before the entrance to a large dance floor. In this lobby there was a ticket booth and over the window of the ticket booth there was a fairly large sign reading: "Smorgasbord, all you can eat, $2.00." Beyond the lobby was the dance floor with tables around the sides and a bar at one end. The officers noticed a lady selling tickets in the booth and observed some people just ahead of them buy tickets. When they

entered the ballroom they saw about two hundred forty people playing bingo. This game is played with cards filled with squares which are numbered and the players had little red discs to place on the cards according to the number called by the person running the game. The sheriff said: "I observed the game as it was conducted. As this man would call out numbers, the participants, if they had the same number on their card, would put little red discs on that number, and when they got a line either straight across or diagonal, they would holler 'bingo'. Then one of them would come up and read the numbers back to the talker, and if the numbers were correct, they would receive a prize. The prizes consisted of, as I observed, $5.00 a game; every fifth game was played for $10.00. They also had one game, a jackpot, of $40.00."

The food was laid out on the counter or bar. It consisted of different kinds of cold meats, baked beans, salads, and perhaps other similar dishes and bread and coffee. The officers witnessed thirty-one games of bingo with prizes of five or ten dollars; also someone won the $40 jackpot while they were there. The sheriff said the defendant, who was present in the ballroom, told him that he, as president of the Carter Lake Recreation Club, was in charge of the game, and the sheriff arrested him and took him to the police station.

The rest of the evidence was introduced by defendant. The following are portions of defendant's own testimony: "When they went in they bought a ticket. They commence serving dinner at 6:30 and continued to serve food to patrons who were there until 8:30. There was food served after 8:30. The bingo game commenced at eight o'clock. During the time that the game was being conducted food was served for thirty minutes. There was food available to anyone who wanted additional servings and helpings after eight. The food was spread out in smorgasbord style on what is commonly termed as the 'bar' so you could line up and follow the bar around and take whatever you wanted. The individual patrons were served with food by helping themselves. There is no limit on the amount of food he could have. Anyone could have as much food as they wanted. A charge was made for the food of $2.00 and in return for the $2.00 anyone who presented a ticket could have as much as they wanted to eat. * * *

Just inside of the building there were signs posted on the premises of the Carter Lake Club advertising this dinner. There were two signs. One was on the east side of the cashier's cage and the other on the door as you left the lobby going in the main room. Those signs said 'Smorgasbord style dinner, $2.00; all you can eat.' Dinner is served from 6:30 to 8:30. Entertainment starts at 8 p.m. There was one other sign. It was situated on the east side of the cashier's cage, 'Bingo free.' It was below the sign advertising the dinner. * * * Q. To your knowledge was any additional charge made for the privilege of playing the bingo game? A. There was not. Q. What was the purpose of conducting the game on that evening, Mr. Mabrey? A. It was for the convenience and pleasure of the patrons of the place. Q. For those who attended to buy a meal, is that correct? A. Yes sir."

Several patrons who dined at the club and played bingo that night testified for the defendant. While many objections to questions designed to ascertain a patron's idea as to the value of the meal were sustained, most of them managed to testify that they felt the meal was worth the $2.00 they paid. One patron interrogated by defense counsel testified as follows: "Q. Were you required to pay anything in order to play the game? A. Oh, no; just my supper. Mr. Walsh: You paid $2.00 when you went in the building? The witness: Yes, I did."

Another patron said: "I was charged $2.00 for my supper. The fact that they were going to play thirty-five games of bingo had nothing to do with my going there. I went down there with some friends of mine for the same reason I came here to Crystal Lodge in Council Bluffs. I enjoy bingo once in a while. It is just a pastime. The night I was present, they played thirty-five games. Every fifth game was a $10 game and the jackpot, $40. There were around about 200 people there that evening."

Another patron said on direct examination: "I played bingo after dinner. I was not required to pay an additional consideration in order to play bingo."

Another patron said on direct examination: "I played a game called 'bingo' after the meal. I was not required to pay any additional moneys or consideration in order to participate in the game. My husband went to the Carter Lake Club with me. He

was with me all evening. Q. To your knowledge, was he required to pay any consideration in order to play bingo? A. Paid for his dinner."

The trial court found defendant not guilty and the State has appealed. It fairly appears in the trial court's written findings and judgment that the court felt compelled to hold the defendant not guilty, under our holding in the so-called "bank night" case of State v. Hundling, 220 Iowa 1369, 264 N.W. 608, 103 A. L. R. 861, and because the statute, section 726.1, Code, 1950, did not prohibit bingo by name.

I. It is admitted and the trial court held that defendant was the keeper of the place within the statute prohibiting any person from keeping a place "resorted to for the purpose of gambling" or that he had care and control of the place within the statute prohibiting him from permitting or suffering "any person [therein] to play at cards, dice, faro, roulette, equality, punchboard, slot machine or other game for money or other thing." Section 726.1, Code, 1950. The trial court in his written findings stated: "It is not only the prerogative but the duty of the legislative branch of government to be specific in its prohibitions. If 'Bingo' is to be illegal in Iowa it is not a difficult matter to include it specifically in section 726.1. This game has become of age and worthy of Christening and either specifically prohibited or openly tolerated, and not left for the sanction or disapproval of a particular judge." Elsewhere in his findings the court made it clear that he felt the lack of specific prohibition of bingo in the statute forced "the court to apply its personal opinion as to whether bingo as played in the present case was gambling." This finding ignores that part of the statute prohibiting one from permitting or suffering others "to play * * * other game for money * * *." Without now going into all of the details of the playing plan here adopted, we hold the game of bingo would receive no immunity merely because it was not specifically named. The legislature could hardly be expected to match the ingenuity of the keepers of gambling houses as to game names or even as to all game rules. Whether the game of bingo is to be honored with statutory "christening" is for the legislature to decide. Like many such games it would not be gambling per se but it is well

within the prohibition of the statute if it is a game played for money or other thing. 54 C. J. S., Lotteries, section 10, page 857; Creash v. State, 131 Fla. 111, 114, 115, 179 So. 149, 150, 151; State ex rel. Trampe v. Multerer, 234 Wis. 50, 289 N.W. 600.

In Creash v. State, supra, defendant was charged with operating a gambling house in that he "kept a house in which 'Bingo' was played." In the course of the opinion the court quoted the statute, much like ours, prohibiting one from operating a house in which he permitted " 'any person to play for money or other valuable thing at any game whatever * * *.' " In upholding the conviction, the court said: "To constitute gambling, it is immaterial by what name it is called if the elements of gambling are present and it is condemned by statute in nothing more than the use of the generic term."

II. Defendant testified and he concedes in argument that if the game in question was gambling, it was in the nature of a lottery, and also that prizes were given and that the recipients were determined by chance. The sole argument advanced by defendant is that here there was no consideration paid by those participating in the game, hence one of the three elements required to constitute a lottery was lacking. In considering this question we will look only to the evidence of defendant and his witnesses, though in our opinion it does not in any material matter dispute the State's evidence.

The operation as defendant outlined it is that the bingo game was furnished to all patrons who attended and bought the $2.00 meal. The trial court seemed to find this was the plan of operation and he stated the real question was whether "the $2.00 charged for the 'Smorgasbord' [was] for the cost of the dinner, or for the right to play bingo, or if in part, how great a part?" The trial court's findings do not answer the question, but no answer is necessary to brand the scheme a lottery. Whether a dinner patron did or could receive his full money's worth in the dinner defendant furnished would be immaterial. If his dinner ticket entitled him to play bingo then he paid for admission to the game. State ex rel. Manchester v. Marvin, 211 Iowa 462, 233 N.W. 486; Horner v. United States, 147 U. S. 449, 13 S. Ct. 409, 37 L. Ed. 237. Even in the bank night cases, which defendant

contends are authority for his position, the courts have consistently held the scheme is a lottery where participants are limited to ticket purchasers. See State ex rel. Cowie v. LaCrosse Theaters Co., 232 Wis. 153, 286 N.W. 707; People v. Gonzales, 62 Cal. App.2d 274, 144 P.2d 605; Commonwealth v. Lund, 142 Pa. Super. 208, 15 A.2d 839; 54 C. J. S., Lotteries, section 10. The operation is always a lottery when participants pay for a chance to win a prize. It is no less a lottery when there is other consideration furnished for the payment. There need be no inquiry into the proportion of the price paid for the ticket which might be considered applicable to the right to play the game of bingo. It is enough that whoever purchased a dinner ticket, purchased a chance for the prize. The three elements of lottery were present: the payment of a consideration for a chance to win a prize.

Defendant seems to concede the scheme is a lottery if participants are confined to ticket purchasers and he makes no attempt to distinguish the authorities cited by the State, but he contends his evidence establishes that participants were not *required* to purchase dinner tickets. He now contends his evidence shows his plan of operation was such that bingo was "free" in the sense that one could play the game without buying the $2.00 dinner. Defendant points to the sign "Bingo free" and his testimony that no one *had* to pay anything for the purpose of playing bingo. This latter evidence was stricken on the ground it was a conclusion. Whether the ruling was correct or not is immaterial. Clearly the trial court did not consider it.

We think defendant testified the bingo was free to ticket purchasers. He said "they bought a dinner ticket when they went in" and under questioning by his own counsel he said no "additional charge" was made for the privilege of playing bingo and that his purpose in conducting the game was for the convenience and pleasure of those who attended to buy a meal. There was no testimony that anyone did play the game without first having purchased a $2.00 dinner ticket. On the contrary, the participants who testified for defendant all said they paid $2.00. The question was whether defendant conducted a lottery on the night of June 21. Under all of the testimony, defendant's included, all who played bingo paid $2.00 to get into the room where bingo was played.

The present argument of defendant is an attempt to bring his scheme of operation within the rule of our so-called "bank night" case, State v. Hundling, 220 Iowa 1369, 1372, 264 N.W. 608, 609, 103 A. L. R. 861, and a few other bank night cases that have followed it. The plan involved in the Hundling case was a drawing of numbers on the moving-picture theater stage to determine which of the persons who had registered their names in books maintained by the theater should receive a cash prize. Anyone could register on a numbered line in the books and the winning name was announced from the stage and at the theater front door. All that was required was that the announced winner appear and claim the prize within two and one-half minutes and if he were outside the theater he would be admitted without charge to claim the prize.

The opinion by Powers, J., with five judges concurring, holds the plan was not a lottery by stating: "To have a lottery * * * he who has the chance to win the prize must pay, or agree to pay, something of value for that chance."

We cannot upon this appeal by the State make any determination of fact. Section 793.20, Code, 1950; State v. Meyer, 203 Iowa 694, 213 N.W. 220; State v. Wickett, 230 Iowa 1182, 300 N.W. 268. We must accept the scheme the trial court found. We think there was no dispute at all in the testimony and the trial court correctly found the game was limited to ticket purchasers. The error of law was the holding that such an operation would not constitute a lottery without regard to how much was paid for the dinner and how much for bingo. Defendant's answer to the legal proposition is an argument of fact which we cannot decide. We cannot, on this appeal by the State, determine the fact that defendant's testimony goes so far as to establish a scheme that would admit bingo players without their purchase of a ticket and then decide the legal consequences of the operation of such a scheme. The operation of such a scheme might or might not be similar to the bank night plan in the Hundling case. For a bank night case with a bingo game for a theater audience and also those outside the front door and a prize for the winner, see Commonwealth v. McLaughlin, 307 Mass. 230, 29 N.E.2d 821. There it was held the operation was a lottery. Even if defendant's

scheme or plan of operation was similar to the bank night plan we are not prepared to say we would reaffirm the Hundling case. That decision is, as the attorney general says in his brief, against the weight of authority in other states. It was one of the early bank night cases decided in January 1936 and it followed an earlier decision of the Appellate Department of the Superior Court of Los Angeles County, California (People v. Cardas, 137 Cal. App. (Supp.) 788, 28 P.2d 99), decided in 1933, where a plan somewhat resembling the bank night plan was held not to be a lottery. Since the decision in the Hundling case there have been decisions of the courts of last resort in many other states. The weight of the authority of these decisions is that the bank night scheme conducted as in the Hundling case is a lottery. Annotations 103 A. L. R. 866; 113 A. L. R. 1121; 34 Am. Jur., Lotteries, section 9; 54 C. J. S., Lotteries, section 10.

We seem to have established a practice of stating a criminal appeal is reversed when, on the State's appeal, we find errors of law. Of course the trial court's judgment is affirmed by operation of law, so only in the sense that error as noted was committed, the cause is reversed.—Reversed.

All JUSTICES concur except LARSON, J., not sitting.