IDEA RESEARCH AND DEVELOPMENT CORPORATION, appellant, v. EVAN HULTMAN and CENTRAL BROADCASTING COMPANY, appellees.

No. 51464.

(Reported in 131 N.W.2d 496)

NOVEMBER 17, 1964.

Bump, Jordan & Holmes, of Des Moines, for appellant.

Dickinson, Parker, Mannheimer & Raife, of Des Moines, for Iowa Broadcasters Association, amicus curiae.

William J. Yost, Assistant Attorney General, for appellee Evan Hultman.

Edward J. Kelly of Whitfield, Musgrave, Selvy & Kelly, of Des Moines, for appellee Central Broadcasting Company.

PETERSON, J.—This declaratory-judgment action was instituted by plaintiff against Central Broadcasting Company and Evan Hultman, Attorney General, to:

1. Determine the validity of plaintiff's contract with the broadcasting station.

2. Enjoin WHO-TV from breach of contract with plaintiff.

3. Enjoin the Attorney General from his threatened action against the station.

The trial court dismissed the petition, and granted an injunction against WHO-TV and the Attorney General. Plaintiff appealed.

Plaintiff is what is known as a television packager and is the owner of a program known as "TV Bingo". In the conduct of its business plaintiff sells its program to various individual sponsors and arranges with a TV facility for the broadcasting of the program. With reference to the case at bar the program "TV Bingo" was sponsored by Skelly Oil Company, Safeway and Rexall Drugstores in Des Moines. The program was carried by WHO-TV in said city.

Plaintiff furnished to WHO the mechanical equipment necessary for the operation and the broadcasting of the game. The equipment used to select the bingo numbers was a device which mixed numbered ping-pong balls by forced air, and the selection of the winning number was based strictly and honestly

upon chance. The prize was a pyramiding one, $25 being the maximum prize on the first day of each individual bingo game. If the prize was not won on the first day the game continued on the second day with a new set of numbers and the prize increased by $25 each day. It was part of the contract between plaintiff and WHO that the funds with which to pay the prizes were furnished by plaintiff.

It was a necessary part of the program that the sponsors' products be mentioned a particular number of times each day when the program was on the air. In the instant case Idea Research contracted for television broadcasting time from 9 to 9:30 each morning, on the theory that it is the women, usually at home at those hours, who are fascinated with the playing of bingo. It has been plaintiff's experience that these gaming programs attract great attention and are valuable to sponsors as well as to the station.

The rules for participating in the game were explained at the time of the broadcast of the show on television and also to the store managers of the sponsors of the game. To participate it was necessary for an individual to make a trip to the place of business of the sponsor. The bingo cards were then given by the sponsor to the participants free of charge. As a part of the rather large sum of money which each sponsor paid for participation in the scheme such sponsor was furnished with 10,000 bingo cards. If the sponsors desired more cards above that number they could buy them from plaintiff at the rate of $3 per thousand cards. The sponsor could not buy the program alone. He must also buy the bingo cards. A new' game began each week, and it was necessary for participants wishing to have a part in the bingo game to return to the sponsors' place of business and obtain a new card each week. One of the purposes of having new bingo cards each week was to get the individual customer back into the store again and again. No person under eighteen years of age could receive the cards or take part in the game. No bingo cards were mailed to participants nor were any located outside of the store. The participant had to go to the store to pick them up.

It was the purpose of this game to increase floor traffic in

the sponsors' place of business. Increased floor traffic resulted in increased sales. The cards were usually kept at the check stand and oftentimes also at what was known as the courtesy counter. No card was given to an individual unless it was asked for. The sponsors' instructions were to hand out one bingo card to a customer, that is, only one card per visit to the sponsors' place of business. The record discloses that many cards were given out in connection with purchases being made at the sponsors' place of business. In the instant case the sponsors had contracted to accept the promotional plan for at least a period of thirteen weeks. The contract by plaintiff with WHO-TV involved a very substantial sum to be paid to the television station for its use of the time each morning. The record discloses clearly that new customers were obtained by some of the sponsors as a result of the presence of the TV bingo cards at their respective places of business. Most sponsors experienced an increased flow of floor traffic and an increased amount of business after they joined in this advertising scheme. Witnesses for sponsors testified from 20 to 50 percent of the people asking for cards purchased merchandise. One sponsor testified it experienced the best business month of the year during the comparatively short time the TV bingo cards were available at its place of business.

On November 21, 1963, the Attorney General of Iowa notified the sponsors and Central Broadcasting Company that the promotional scheme referred to as "TV Bingo" appeared to constitute a lottery in violation of section 726.8, Code of Iowa, and that it should be discontinued. In response to such notice and to some personal conferences with the Attorney General the program was discontinued on November 22, 1963.

This action for declaratory judgment for injunction against WHO as to breach of contract and as against the Attorney General followed. After trial the court dismissed the petition and entered an order and decree enjoining defendants from taking action contrary to section 726.8, holding that the scheme which the parties proposed to carry out was in the nature of a lottery under the constitution and statutory provisions of the State of Iowa.

I. The constitutional provision in Iowa with reference to

lotteries appears in Article III, section 28: "No lottery shall be authorized by this State; nor shall the sale of lottery tickets be allowed." To implement said constitutional provision the legislature adopted the provision which is now section 726.8: "Lotteries and lottery tickets. If any person make or aid in making or establishing, or advertise or make public any scheme for any lottery; or advertise, offer for sale, sell, negotiate, dispose of, purchase, or receive any ticket or part of a ticket in any lottery or number thereof; or have in his possession any ticket, part of a ticket, or paper purporting to be the number of any ticket of any lottery, with intent to sell or dispose of the same on his own account or as the agent of another, he shall be imprisoned in the county jail not more than thirty days, or be fined not exceeding one hundred dollars, or both."

To constitute a lottery as provided in the above quoted section three elements must be present: 1. A chance. 2. A prize. 3. Consideration.

Among many cases in our state and other states so holding are the following: State v. Mabrey, 245 Iowa 428, 435, 60 N.W.2d 889, 893 (1954); State v. Mabrey, 244 Iowa 415, 56 N.W.2d 888 (1953); Commonwealth v. Wall, 295 Mass. 70, 3 N.E.2d 28 (1936); McFadden v. Bain, 162 Ore. 250, 91 P.2d 292 (1939).

II. There is no question in the case at bar as to the two elements of chance and prize being present. The question which has been before this court several times and which was before the trial court in the instant case was whether or not there was any consideration given by the participant.

A somewhat similar case was before this court in State v. Hundling, 220 Iowa 1369, 264 N.W. 608, 103 A.L.R. 861. The next case of this nature receiving our consideration was St. Peter v. Pioneer Theatre Corp., 227 Iowa 1391, 291 N.W. 164. Both of these cases were in the nature of what is known as "bank night"—theater cases. In both instances the drawing of prizes was open not only to the customers who bought tickets and entered the theater to see the show, but also to any and all others who desired to participate. All they needed to do was to come and sign a register and ask for a ticket. This court

held there was no consideration given by the participants, and therefore there was no lottery.

Said decisions have been or are now overruled. In State v. Mabrey, 245 Iowa on page 436, 60 N.W.2d on 893, we said: "After careful consideration we now decline to follow State v. Hundling, supra."

We now definitely overrule the Hundling case and specifically state that we overrule St. Peter v. Pioneer Theatre Corp., supra, so far as it is in conflict with our opinion here.

In the second case of State v. Mabrey appearing in 245 Iowa 428, on 435, 60 N.W.2d 889, on 893, we analyzed at length the question of the nature of consideration to be paid by a participant in a scheme such as the one involved in this case. The consideration does not need to be a money consideration. It can be in the nature of the participant doing something in the way of going each day or each week to the place of business of the sponsors and picking up a TV bingo card. There is consideration for all participants when some pay or buy merchandise, and others do not.

In the second Mabrey case the facts were that 263 participants in the bingo game purchased a ticket for the dinner. Eighty-three participants did not buy dinner tickets. Mabrey provided that all people who came to the place where the game of bingo was being played were entitled to participate whether or not they had purchased a dinner. We said in the second Mabrey case (at page 435 also): "It did not cease to be a lottery because some were admitted to play without paying for the privilege, so long as others paid for their chances. Presence of the nonpaying participants did not change the status of those who paid. If it was a lottery as to some who played the game it was nonetheless a lottery."

The trial court in the instant case followed our decisions in the Mabrey cases. The court followed such decisions even to the extent of using some of the language used in the Mabrey cases as follows: "The game of TV Bingo was, in any event, a lottery at least as to those who purchased a product of the sponsor in connection with obtaining a TV Bingo card. It did not cease to be a lottery because some were permitted to play

the game without purchasing any product, so long as others paid for their chances." By following our Mabrey cases, the trial court correctly dismissed the petition in the instant case.

III. The subject has had extensive consideration in the courts of many states. The decision we are making is sustained by the great weight of authority of the Supreme Courts of many other states: Blackburn v. Ippolito (Fla. App. 1963), 156 So.2d 550; Lucky Calendar Co. v. Cohen, 19 N. J. 399, 117 A.2d 487; Midwest Television, Inc. v. Waaler (1963), 44 Ill. App.2d 401, 194 N.E.2d 653; Journal Square Merchants Assn. v. McNamara, 19 N. J. 419, 117 A.2d 498; State v. Jones, 44 N. M. 623, 107 P.2d 324; Knox Industries Corp. v. State ex rel. Scanland, Okla., 258 P.2d 910; State ex rel. Draper v. Lynch, 192 Okla. 497, 137 P.2d 949; State v. Wilson, 109 Vt. 349, 196 A. 757; Maughs v. Porter, 157 Va. 415, 161 S.E. 242; State v. Greater Huntington Theatre Corp., 133 W. Va. 252, 55 S.E.2d 681; State ex rel. Regez v. Blumer, 236 Wis. 129, 294 N.W. 491; State v. Laven, 270 Wis. 524, 71 N.W.2d 287; State v. Danz, 140 Wash. 546, 250 P. 37, 48 A. L. R. 1109; McFadden v. Bain, 162 Ore. 250, 91 P.2d 292; Glover v. Malloska, 238 Mich. 216, 213 N.W. 107, 52 A. L. R. 77; Smith v. State, 136 Tex. Cr. 611, 127 S.W.2d 297; Commonwealth v. Wall, 295 Mass. 70, 3 N.E.2d 28.

Some significant statements pertinent to the decision we are rendering herein have been made by various courts in rendering their decisions. A few of such helpful and significant statements are as follows:

From Commonwealth v. Wall, supra, at page 73 of 295 Mass.: "* * * a game does not cease to be a lottery because some, or even many, of the players are admitted to play free, *so long as others continue to pay for their chances. * * * So here the test is not whether it was possible to win without paying for admission to the theater. The test is whether that group who did pay for admission were paying in part for the chance of a prize.*" (Emphasis added.)

From McFadden v. Bain, supra, 162 Ore. 250, 255, 91 P.2d 292, 295: "To constitute a lottery, it is not necessary for all participants to pay for their chances, but it is sufficient if some

do though many do not pay a valuable consideration. The legal effect of the transaction is not changed by the fact that some do not pay. If it is a lottery as to those who do pay, it necessarily is a lottery as to those who do not pay for their chances."

State v. Danz, supra, 140 Wash. 546, 250 P. 37, says in substance: The proposal to distribute prizes was obviously known and the defendant's purpose was to induce the purchase of tickets of admission; it is only fair to presume that the means employed was adopted to achieve the end desired. So long as the payment of consideration is both desired and probable, and is not unreasonable generosity, the mischief against which the lottery laws are directed is present. The existence of an option to obtain a chance without paying for it should be immaterial when there is reasonable probability that most contestants will pay consideration before the contest is ended.

From 45 Harvard Law Review 1196, 1207: "Everyone buying the goods contributes to the maintenance of the scheme, since the seller spreads the cost of the prizes over what is presumably an increased number of customers. As the quantum of consideration derived from each participant is immaterial, the courts have fairly uniformly held that the gift enterprise remains a lottery even though the contestants pay no more than the goods are worth."

From Lucky Calendar Co. v. Cohen, supra, 19 N. J. 399, 414, 417: "It is manifestly not in the public interest to permit the element of chance to control such a vital commodity as food, far reaching as it is in its effect on the national economy. To do so, in the largest industry in the country, would be to encourage a battle of industrial giants for increased business to the detriment of the public." The same case also states: "Consideration is in fact clearly present here, both in the form of a detriment or inconvenience to the promisee at the request of the promisor and of a benefit to the promisor. It is hornbook law that if the consideration is sufficient to sustain a simple contract (if otherwise legal), it is sufficient to satisfy this third alleged element of lottery."

State ex rel. Regez v. Blumer, supra, 236 Wis. 129, 294 N.W. 491, says in effect: It is manifest that we have here the

prize and the chance. The only remaining element of a lottery is a consideration. The facts of the registrants' going to the store each day to get the daily coupon and that the operation of the scheme paid the defendant or he would not operate it, constitute a consideration. Consideration consists in a disadvantage to the one party or an advantage to the other. We here have both.

State ex rel. Line v. Grant, 162 Neb. 210, 75 N.W.2d 611, states in substance: Where a promoter of a business enterprize, with the evident design of advertising his business and thereby increasing his profits, distributes prizes to some of those who call upon him or his agent, or put themselves to trouble or inconvenience, even of a slight degree, or perform some service at the request of and for the promoter, the parties receiving the prize to be determined by lot or chance, a sufficient consideration exists to constitute the enterprize a lottery though the promoter does not require the payment of anything to him directly by those who hold chances to draw prizes.

It is abundantly clear that the element of consideration is present in the case at bar and the flowing of some consideration from the participant to the donor appears not only in the Mabrey cases in our state but in similar cases in many states.

The judgment and decree of the trial court therefore should be and is affirmed.—Affirmed.

GARFIELD, C. J., and THOMPSON and LARSON, JJ., concur.

SNELL, THORNTON, MOORE and STUART, JJ., dissent.

HAYS, J., not sitting.

The members of this court being equally divided, the judgment of the trial court stands affirmed (section 684.10, Code 1962).

SNELL, J.—I respectfully dissent. I think the premise on which the holding is based is wrong, the factual situation necessary to support the finding is lacking and the result is unsound.

Our constitutional and statutory provisions against lotteries and gambling are strict and enacted for the protection of the

public welfare. That is a proper legislative function but the evils against which the laws and our own decisions are aimed are not present here. We are not here engaged in a crusade against evil. There is nothing anymore evil here than there is in sending in the answers to a cross-word puzzle or answering the telephone and giving the correct answer on a radio quiz show. Our problem here is what constitutes a lottery under the statute and not whether a lottery is evil.

The two Mabrey cases cited and relied on by the majority did not involve the same statute as is relied on here. In the Mabrey cases the prosecution was under section 726.1, Code of Iowa. That statute proscribes permitting any person in any house or other place under his (defendant's) control playing any game for money or other thing. The defendant operated an eating establishment and offered amusement in the form of bingo games played for money. By permitting such play in his place he was within the terms of the statute. There was a game played for a money prize in defendant's place.

Although under the statute the game might have been found illegal without being a lottery the question of lotteries was discussed.

In the first Mabrey case it was said that the game was a lottery at least as to those who purchased tickets. In the second Mabrey case it was held: "It did not cease to be a lottery because some were admitted to play without paying for the privilege, so long as others paid for their chances. Presence of the nonpaying participants did not change the status of those who paid. If it was a lottery as to some who played the game it was nonetheless a lottery." 245 Iowa 428, 435, 60 N.W.2d 889, 893.

In the case at bar we have a different statute and a different factual situation. The statute now involved is section 726.8 quoted by the majority. As said by the majority to constitute a lottery three elements must be present. (1) Chance. (2) A prize. (3) Consideration. Here we have a chance and a prize but I find no consideration.

The purpose of the sponsor was to increase floor traffic. That is the purpose of any advertising program, offer of prizes

given away or special discounts on certain items. The fact that it was successful proves nothing except that it was an attractive scheme. At the Worlds Fair a prize was given the one millionth person who bought a ticket. I do not think all such things should be enjoined under the guise that they are lotteries.

Trading stamps are given to encourage people to trade at a particular store. With them there is no element of chance but certainly a consideration lacking here.

In the case at bar it was not necessary for a person to do anything except pick up a card at the check stand or the courtesy counter. The cards were free. I do not think accepting one from the cashier or picking one up from the courtesy counter entailed such an arduous effort as to be considered the rendering or paying a consideration.

Undoubtedly increased floor traffic tends to increase business but there is no suggestion that anyone bought any gasoline, groceries or drugstore products that were unneeded or that would not have been purchased in any event.

The question is not what the stores paid plaintiff for the program or what was paid the television station for the telecast. The question is the consideration, if any, paid by the person picking up a card. He pays nothing and does nothing except accept what is given free.

It is not for us to condemn a scheme because it is successful as an advertising gimmick nor even because it may appeal to prospective customers as a chance to get something for nothing.

The only question before us is one of consideration on the part of one who receives or picks up a card. I think it unsound to say there was consideration here.

I would reverse.

THORNTON, MOORE and STUART, JJ., join in this dissent.