234 So.2d 665 (1970)
GREATER LORETTA IMPROVEMENT ASSOCIATION, a Non-Profit Corporation, Appellant,
v.
STATE ex rel. Arthur T. BOONE, Appellee.
No. 37933.
Supreme Court of Florida.
April 22, 1970.
Rehearing Denied May 20, 1970.
*667 George B. Stallings, Jr., of Stallings & Marr, Jacksonville, for appellant.
William H. Maness, Jacksonville, for appellee.
ADKINS, Justice.
This is a direct appeal from a summary final judgment declaring Fla. Stat., § 849.093, F.S.A. (Bingo Statute) to be unconstitutional and void and enjoining appellant from conducting bingo games.
This case involves the meaning of the word "lottery" as used in Sec. 23, art. 3, Fla. Const. (1885), F.S.A. so as to determine whether the Bingo statute is compatible or in conflict with the Constitution.
The word "lottery" is a generic term and is not defined in the Constitution nor in any of the statutes of this State. There are conflicting lines of decisions defining the word "lottery." See 9 Fla. Law Review 93 (1956) where these decisions are discussed. The article suggests "a legislative enactment defining an unlawful lottery" and expressly eliminating the requirement that the lottery must be of widespread effect to violate the Constitution.
State-authorized lotteries were very common in the first decades of this nation's history. Most states used them to raise money, including Florida; the territorial Legislature in 1828 created Union Academy in Jacksonville, and authorized its trustees to raise $1,000 for it by lottery. Page 279, Acts of 1828. The use and control of lotteries had been established long before. New York, while still a British colony, passed what became a typical law, outlawing all lotteries except those "authorized by the Legislature." Ch. XVII, Laws of the Colony of New York, 1774. When New York prohibited lotteries in its 1821 Constitution, it said, "No lotteries shall hereafter be authorized * * *." Sec. 11, art. VII, Const. (1821). This command clearly speaks to the Legislature. An "authorized lottery" is one "expressly authorized by law." 38 Corpus Juris 323 (1925).
In the years before Florida adopted its lottery prohibition, governmental interest in lotteries was financial. "Lotteries were formerly often resorted to as a means of raising money by states * * * and are still authorized in many foreign countries and in a few of our states * * *." 2 Bouvier's Dictionary 127 (1885). Lottery revenue measures were passed for many purposes. For example, in Maryland purposes included Washington College (Ch. 193, Laws of Maryland (1823)), a statute of George Washington (Ch. 125, (1824)), turnpike roads (Ch. 140, (1945); Ch. 200, (1845)), and river channel clearing (Ch. 80, (1853)). In its (1851) Constitution, Maryland banned lotteries, saying no more grants "shall ever hereafter be authorized by the Legislature." Art. III, Sec. 37.
By 1867, twenty-one states had banned lotteries, and almost universally the language was addressed to the Legislatures. By 1885, twenty-nine states had banned lotteries, with all Constitutions but one speaking to the Legislature; one (Louisiana) reversed itself to permit the Legislature to authorize lotteries. Prohibition in Legislative Article: Florida Art. III, Sec. 23 (1885). Tennessee Art. XI, Sec. 5 (1834). Michigan Art. IV, Sec. 27 (1850). Arkansas Art. V, Sec. 41 (1868). Rhode Island Art. IV, Sec. 12 (1842). New Jersey Sec. VII, Art. 2 (1844). Iowa Art. III, Sec. 28 (1857). Wisconsin Art. IV, Sec. 24 (1848). California Art. IV, Sec. 26 (1879). Maryland Art. III, Sec. 35 (1864). Minnesota Art. IV, Sec. 31 (1857). Nevada Art. IV, Sec. 24 (1864). Missouri Art. IV, Sec. 28 (1865). Nebraska Art. III, Sec. 21 (1875). Virginia Art. V, Sec. 18 (1870). Illinois Art. IV, Sec. 27 (1870). Alabama Art. IV, Sec. 26 (1875). Authorization of Lottery Prohibited: New York, Art. I, Sec. 10 (1846). Colorado Art. XVIII, Sec. 2 (1876). Mississippi Art. XII, Sec. 15 (1868). Louisiana Title VI, Art. 113 (1852) amended to permit Legislature to authorize lotteries in 1879. Texas Art. XII, Sec. 36 (1868). Indiana Art. XV, Sec. 8 (1851). West Virginia Art. XI, Sec. 1 (1861-63). Georgia Art. I, Sec. 23 *668 (1868). Lotteries Prohibited "for any purpose": Ohio Art. XV, Sec. 6 (1851). Oregon Art. XV, Sec. 4 (1857). South Carolina Art. XIV, Sec. 2 (1868). Unrestricted Language: Kansas Art. 15, Sec. 3 (1859) (but see restrictions in Art. XVI, Sec. 6, Constitution of 1858; Art. XV, Sec. 2, Constitution of 1855).
It was stated that in "many of the States, the authorizing of lotteries by the Legislature is inhibited, and it is also required that the sale of lottery tickets shall not be allowed." Florida is footnoted as one of the states included. XIII American and English Encyclopedia of Law 1173 (1890).
This Court in Lee v. City of Miami, 121 Fla. 93, 163 So. 486 (1935), studied the meaning of the lottery prohibition, and concluded it referred to authorized lotteries, not private gambling. Quoting from Phalen v. Virginia, 8 How. (U.S.) 163, 168, 12 L.Ed. 1030, we said:
"`Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the wide-spread pestilence of lotteries. The former are confined to a few persons and places, but the latter infests the whole community: it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple.'
"* * *
"[W]e must conclude that the people of this state had in mind such a lottery as was referred to in Phalen v. Virginia * * *."
Although all of the standards set forth in Lee v. City of Miami, supra, were not followed in some of the subsequent decisions, this Court has never receded from or overruled the Lee case. It is still good law, and was sufficient authority to give the Legislature confidence in enacting the Bingo law.
While some of the subsequent decisions were not entirely consistent with Lee v. City of Miami, supra, and the varying opinions were never reconciled with each other, none were ever overruled. Under these circumstances the Legislature may choose to rely more substantially on one than the other. For this Court to step in now and to recede from the very decision the Legislature relied upon could create instability in the law.
We cannot declare the Bingo law unconstitutional unless we overrule Lee v. City of Miami, supra, and this would do violence to the time-honored doctrine of stare decisis.
In 1832, only four years after a lottery had been authorized for Union Academy, the Florida Legislature banned all gaming. Sec. 1, Acts of the Legislative Council (1839); modified Ch. 75, Laws of Florida (1846); Ch. 542, Acts of Florida (1868).
In 1868, the anti-lottery provision was inserted in the new Constitution. Immediately after, the Legislature enacted new laws outlawing lotteries and related activities. Ch. X of Ch. 1637, Acts of Florida (1868).
Ten years later, the Legislature imposed a license tax on certain gambling games, including "keno." Ch. 3099, Sec. 11, Laws of Florida (1879). The Act of 1868 forbidding lotteries was not disturbed.
"Keno" is "a game which stops and a player wins when he has five numbers in a row on a card purchased by him corresponding with numbers on balls, drawn from a globe, or other receptacle. It is said to resemble a lottery, and in some respects a raffle, but not to resemble faro or roulette." 38 C.J.S. Gaming § 1, pp. 40, 41. Keno resembles Bingo in that both are likened to Tango. 38 C.J.S. p. 43.
It is clear that the Legislature, in 1879, considered that the bingo-like game of Keno was not forbidden under the Florida anti-lottery provision of the Constitution.
In 1881, this Court faced the question whether the Legislature had power to impose *669 a license tax on this game resembling bingo. Overby v. State, 18 Fla. 178 (1881). The case arose when a Jacksonville licensee was arrested for violating the anti-gambling law.
The Court held that keno is a gambling game, but went on to say (at page 183) that the Legislature by authorizing licenses to operate keno games "legalized this game of `keno' and made it, by the license tax imposed, a source of revenue to the State * * *." No constitutional arguments were presented. Overby's conviction was set aside, as were the convictions of three other licensees. Hazen v. State, 18 Fla. 184 (1881).
The correctness of this decision was verified by the Legislature in the same year, when it expressly repealed all laws in conflict with its licensing statute for gambling. Ch. 3277, Acts of Florida, 1881.
In 1885, four years after Overby, supra, the exact language of the anti-lottery provision of the 1868 Constitution was written into a new Constitution (Sec. 23, Art. III, Const. (1885)). By establishing rules of construction, the Overby decision retained its authority under the new Constitution.
Therefore, since the Florida Legislature was empowered in 1879 to legalize and license the bingo-like game of keno, it was empowered in 1967 to legalize bingo. Precedent commands this conclusion.
Fourteen years after Overby, the Legislature enacted a new statute governing lotteries and games of chance. Ch. 4373, Laws of Florida, 1895. Gambling in its various forms, and lotteries, are illegal under present law. Ch. 849, F.S.A. Bingo or Guest games do not violate this statute, if played within the restrictions imposed by the Legislature. Ch. 67-178, § 1, Laws of Florida, 1967 § 849.093, F.S.A.).
Subsequent decisions of this Court have been compatible with Overby. In Lee v. City of Miami, supra, this Court upheld a statute to license some types of coin-operated machines and concluded the constitutional anti-lottery provision related to state-authorized lotteries. In Stoutamire v. Pratt, 148 Fla. 690, 5 So.2d 248 (1942), this Court upheld a statute permitting coin-operated amusement machines if licensed. Neither case conflicted with State v. Vasquez, 49 Fla. 126, 38 So. 830 (1905), in which this Court found that a slot machine with an element of chance was not protected by a statute permitting licenses for coin-operated machines.
The situation then, as it presents itself in connection with our constitutional provision, is at least that by the decisions of the courts of Florida and other jurisdiction the word "lottery" may have either of several meanings, and that either is reasonable and possible. In such a situation, where a constitutional provision may well have either of several meanings, it is a fundamental rule of constitutional construction that, if the Legislature has by statute adopted one, its action in this respect is well-nigh, if not completely, controlling. As stated in Fargo v. Powers (D.C.), 220 F. 697, 709, it is said:
"If the constitutional provisions in question are susceptible of two constructions  one being that contended for by complainants, the other that taken by the Legislature  the action of the Legislature in adopting one of those constructions and enacting a statute carrying it into effect, as thus construed, must be deemed conclusive. That rule is: `That the acts of a state Legislature are to be presumed constitutional until the contrary is shown; and it is only when they manifestly infringe some provision of the Constitution that they can be declared void for that reason. In case of doubt, every presumption, not clearly inconsistent with the language or subject-matter, is to be made in favor of the constitutionality of the act. The power of declaring laws unconstitutional should be exercised with extreme caution and never where serious doubt exists as to the conflict.'"
*670 In Jasper v. Mease Manor, Inc. (Fla. 1968), 208 So.2d 821, this Court sustained a statute defining the word "charitable" as used in the Florida Constitution even though such definition conflicted with earlier decisions by this Court. Similarly, in Ammerman v. Markham (Fla. 1969), 222 So.2d 423, this Court upheld a legislative definition of the terms "real property" and "dwelling house" as used in the Constitution even though such definitions were in conflict with earlier decisions of this Court.
Although the question of whether various transactions constitute lotteries have been considered by the Florida courts many times, the writer's search has revealed no decision holding a statute unconstitutional because it violates the provision of the Constitution prohibiting lotteries. None are cited in appellee's brief.
When the Legislature has once construed the Constitution, for the courts then to place a different construction upon it means that they must declare void the action of the Legislature. It is no small matter for one branch of the government to annul the formal exercise by another of power committed to the latter. The courts should not and must not annul, as contrary to the Constitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the Constitution. This is elementary.
The Bingo law under attack was enacted by the Legislature in 1967, during the regular session of the Legislature. A proposed Constitution was under consideration at the time, and during the special session of June 24-July 3, 1968, the Legislature passed a joint resolution proposing a new Constitution. This Constitution, which was adopted by the people in 1968, contained the following provision as Art. X, § 7:
"Lotteries, other than the types of pari-mutuel pools authorized by law as of the effective date of this constitution, are hereby prohibited in this state." (Emphasis supplied)
Although this provision has no application to the case sub judice, the Bingo law may be considered as a contemporaneous construction of the word "lottery" as used in the Constitution. There is a strong presumption that such contemporaneous construction rightly interprets the meaning and intention of a constitutional provision. 16 Am.Jur.2d, Constitutional Law, § 85. In doubtful cases such a Legislative construction should, and ordinarily will, be followed, unless it is manifestly erroneous. 16 C.J.S. Constitutional Law § 33.
The term "definition" may be said to be synonymous with "description." The Court, as well as the Attorney General, has "described" lotteries many times. F.S.A., § 849.09, prohibits a lottery and provides the penalties for violations of its provisions, but does not define the term. No decision of this Court or opinion of the Attorney General previously rendered bars the Legislature from partially defining a lottery by excepting Bingo.
The moral issue is not before us. The only issue is whether the Bingo law constitutionally excepts the game from the definition of a lottery. Florida decisions, as well as decisions from other jurisdictions, giving a particular definition of a lottery do not require or justify rejection of the current Bingo statute on constitutional grounds.
We are not required to determine whether or not a particular factual situation, such as Bingo, is a lottery within the meaning of a statute prohibiting lotteries. This case involves a legislative construction of the term "lottery," as used in the Constitution.
Although this case was filed under the 1885 Constitution, the 1967 Legislature which passed the "Bingo" statute also functioned under that Constitution and many of the members of that Legislature were instrumental in the writing and passage of the 1969 Constitution. It appears that when the "Lottery" section was placed *671 under the general section entitled "Miscellaneous" in the new Constitution, that Bingo, together with horse racing, dog racing and jai alai, was an exception to the prohibition of lotteries.
Sec. 7, art. X, Fla. Const. (1968) reads:
"Lotteries, other than the types of pari-mutuel pools authorized by law as of the effective date of this constitution, are hereby prohibited in this state."
Those activities comprehended as "pari-mutuel pools" were recognized as lotteries but those in existence and lawful under the case law or legislative statutes prior to January 7, 1969, were "grandfathered in" as exceptions to the prohibition. "Parimutuel pools" is a term applied to horse racing, jai alai, and dog racing and certainly includes bingo by definition.
"`Pari-mutuel' is defined as a pool in betting, as in a horse race, in which each bettor lays a fixed sum on the contestant he selects, and those who choose the winner, divide the entire stake, less percentage of the person who furnishes the pool tickets, literally mutual bets." (Emphasis supplied) Weiss v. Schachter, 275 Ill. App. 26 (1934).
See definitions in Century Dictionary; Ballentine's Law Dictionary. See Utah State Fair Association v. Green, 68 Utah 251, 249 P. 1016 (1926). "PARIMUTUEL. A mutual stake or wager; a betting pool" Black's Law Dictionary. Webster's Third New International Dictionary defines pari-mutuel as follows:
"A system of betting (as on a horse race) in which those who bet on the winner share the total stakes minus a small per cent for the management."
Funk & Wagnalls, New Standard Dictionary (1950) points out the term "paris mutuels" is "sometimes erroneously spelled pari-mutuel as singular, but that which is mutual commonly relates to two." Paris mutuels is defined as follows:
"A pool in betting in which each bettor lays a fixed sum on the contestant that he selects, and those who choose the winners divide the entire stake, less the percentage of the person who furnishes the pool-tickets."
Although the term pari-mutuel is usually considered a method of betting on horse racing, it should be noted that this form of betting has been authorized for dog racing and Jai Alai. At the horse tracks, dog tracks and frontons, all the money paid for gambling tickets are placed in a common fund and paid to the winners less certain portions reserved for taxes to the State and fees due the track or fronton for operating expenses and for profit. The greater amount invested in tickets, the greater amounts one may win if his choice is correct.
Bingo is similar. The player may usually purchase and play on as many cards as may be desired. The greater amount invested in cards the greater is the chance of winning. In both racing events and in Bingo games the hope of winning money prizes is not the only motive for attendance. In both instances entertainment, recreation, and social relations are factors of concern to many and just as important as the process of participating in the betting.
At the time the Constitution of 1968 was being prepared and approved by the Legislature, our lawmakers simultaneously authorized the regulation of Bingo. It seems unreasonable to conclude that the people in adopting the Constitution intended to permit some citizens to continue their betting at the race tracks and at the same time prohibit other citizens from continuing their Bingo games at social gatherings.
In view of the fact that Bingo could be considered the same type of gambling as described in the definition of pari-mutuel, the game of Bingo was "authorized by law as of the effective date of the Constitution of 1968."
Obviously, the makers of our 1968 Constitution recognized horse racing as a type of lottery and a "pari-mutuel pool" but also intended to include in its sanction those *672 other lotteries then legally functioning; namely, dog racing, jai alai and bingo. All other lotteries including bolito, cuba, slot machines, etc., were prohibited. The view that bingo was intended to be included in the exception to the constitutional prohibition against lotteries is more persuasive when the bingo statute, Fla. Stat., § 849.093, F.S.A., is examined and found to contain such stringent limitations against abuse.
The pros and cons of the moral issue involved in Bingo is a matter of legislative, not judicial, concern. We are only confronted with the possible violation of our organic law. For the reasons stated above, it does not appear that the members of the Legislature, who are directly responsible to the people, violated the provisions of the Constitution in authorizing and regulating the game of Bingo. Certainly, the Legislature in one breath did not intend to authorize Bingo and in the next breath prohibit it in a proposed Constitution.
Given the uncertainty of interpretation by this Court as evidenced by its past decisions, given the historical context of the chartered lotteries in Florida and other states and the constitutional amendments designed to control them, given the location of the anti-lottery provision within the Legislative (not the judicial) article of the 1868 and 1885 (as differentiated from the 1968) Constitutions, given the consistent construction of the Legislature through the years in assuming and exercising its power to pass laws regulating and at times legalizing bingo-like games  given these factors, we reach the inevitable conclusion that it would be unreasonable and unjust to rule today that the Legislature lacked authority to legalize bingo and write laws for its control and operation to achieve the very ends and avoid the very vices which were the subject of the anti-lottery provisions of 1868 and 1885; the 1967 statute is not in conflict, but actually is in harmony with the Constitutions.
Having ascertained the meaning of the lottery provision in years past, we must now reach the question whether bingo is invalidated by the lottery provision of the Constitution of 1968. We conclude it is not invalidated, being expressly saved by the language of the lottery provision regarding pari-mutuel pools, and also by the doctrine of contemporaneous enactment.
The Legislature, in its wisdom, has seen fit to permit this form of recreation for those unable to participate in the uncertainties of the authorized pari-mutuel pools, and, at the same time, has allowed worthy organizations to receive the benefits. We should abide by the will of the Legislature in the construction of the Constitution.
The judgment and order of the Circuit Court is reversed and the cause is remanded with instructions to enter final judgment for the defendant.
ROBERTS and BOYD, JJ., concur.
ERVIN, C.J., concurs with opinion.
CARLTON, J., dissents with opinion.
DREW and THORNAL, JJ., dissent and concur with CARLTON, J.
ERVIN, Chief Justice (concurring).
I concur in Justice Adkins' opinion and conclude he properly aligns bingo outside lotteries contemplated in and prohibited by the Constitution.
Gambling on horse and dog racing and jai alai contests has been legalized in the state, and its legalization was upheld by this Court. So was slot-machine gambling, although the act legalizing slot-machine gambling was later repealed. It is difficult, from the standpoint of consistent logic and reason, not to judicially uphold the bingo legislation under review in view of our prior decisions upholding the types of gambling above mentioned.
During the time I served as Attorney General and had certain law enforcement duties, I was constantly reminded by bingo players when I attempted to suppress bingo *673 because it was not then permitted by law, that it was hypocritically inconsistent for the state to allow the types of gambling mentioned above while banning bingo. The situation I find here is now different, since the Legislature has legalized a type of bingo and the claim of the state's hypocritical inconsistency is allayed.
I consider the question of bingo gambling to be a problem of public policy for the Legislature to decide, taking into consideration and comparison types of gambling already permitted and judicially upheld in the state, and whether such gambling is an evil, inimical to the public welfare. Incidentally, it is well known that bingo gambling is widely conducted throughout the state and has been so conducted for several years prior to the legislation under review in this case. I think we should accept the legislative policy determination implicit in the enactment before us, leaving to the Legislature and to the future the question whether legalized and regulated bingo should be continued or its legalization repealed.
I would repose in the legislative wisdom regarding the subject of bingo gambling the same deference to grant or refuse that we have accorded the Legislature in the matter of certain types of tax exemptions for charitable, benevolent and religious purposes. See Jasper v. Mease Manor (Fla.), 208 So.2d 821.
CARLTON, Justice (dissenting):
This opinion was initially prepared as a tentative majority opinion. Since it has failed to gain approval of a majority of the Justices, it is now submitted in its entirety as a dissent.
This is a direct appeal from a summary final judgment of the Circuit Court, Duval County, dated October 15, 1968, declaring Fla. Stat. § 849.093 ("Florida's legalized Bingo statute") to be unconstitutional and entering an injunction prohibiting appellant from conducting Bingo games at its clubhouse. The scope of the statute can be gleaned from Section 1, which has been set out in the margin.[1]
Appellant, a non-profit civic improvement association, initiated the playing of Bingo at its clubhouse after passage of Fla. Stat. § 849.093 in 1967, F.S.A. It is conceded that appellant was fully qualified to conduct games under the statute, and also that the games were always operated within statutory guide lines. According to appellant, its games are conducted in the following manner:
"The participants in such game pay the Appellant a sum of money for the use of one or more cards on which there is arranged five horizontal rows and five verticle rows forming twenty-five squares in which numbers have been printed. When the game commences, numbers are drawn by chance from a receptacle, one by one, and announced, the players covering those numbers on cards which they have purchased until the player who gets give numbers in the same horizontal, vertical or diagonal row calls out `bingo' and is declared the winner of a predetermined cash sum of money."
Appellee, a private citizen, protested against appellant's using its building for Bingo, and, under Fla. Stat. § 60.05(1), F.S.A., brought suit for an injunction against appellant in the name of the State. Appellee contended that: (a) Bingo was a *674 lottery; (b) lotteries are prohibited absolutely under Fla. Const., Art. III, § 23 (1885); (c) F.S.A. Fla. Stat. § 849.093, is, therefore, unconstitutional; (d) therefore, appellant's clubhouse was a public nuisance since a place "where games of chance are engaged in violation of law" under Fla. Stat. § 823.05, F.S.A.
In response, appellant asserted that: (a) The constitutional prohibition did not embrace all lotteries; (b) Bingo was at best a form of gambling, and thus its regulation was a matter of legislative prerogative; (c) All games were conducted by appellant in full compliance with statutory regulations.
The Circuit Court found appellee's argument to be persuasive and granted summary judgment accordingly. The opinion of the Court, in part, was that:
"Bingo by any name is bingo and, as pointed out, a lottery. Our Constitution does not distinguish between good and bad lotteries. The argument that Article III, Section 23, embraces only big, bad lotteries but permits small lotteries for good purposes distorts the plain language of the Constitution. Therefore, the Legislature is powerless to authorize any lottery and Section 849.093, Florida Statutes of 1967, adopted by the 1967 Legislature of the State of Florida is unconstitutional, void and of no effect. To hold otherwise would permit the Legislature to invalidate the right of the people to express their will through a Constitution and to change that Constitution only through the amendatory process therein set forth."
The arguments and briefs initially submitted by the litigants before this Court were similar to those presented below. Subsequent to argument here, the Court requested reargument in light of a question regarding pari-mutuel pools which the litigants had not considered. We accepted supplementary briefs on reargument.
We are ever mindful that no rule of constitutional construction is better settled than that if there be a doubt whether a legislative enactment is strictly constitutional, or that if it be not clearly opposed to constitutional restrictions, we may not hold the enactment to be invalid. If we were to hold otherwise, we would then become a law unto ourselves, undertaking to place obstacles in the way of legislation which had not been plainly placed there by the people in framing the Constitution itself, and we would be denying to the people represented by the Legislature a power they themselves had not denied to that branch of government. Yet, we are mindful too that the fundamental object in construing a constitutional provision is to ascertain and give effect to the intentions of the framers and adopters, and also that constitutional provisions must be interpreted in such a manner as to fulfill these intentions rather than defeat them. State ex rel. Dade County v. Dickinson, 230 So.2d 130 (Fla. 1969); State ex rel. West v. Gray, 74 So.2d 114 (Fla. 1954); Cheney v. Jones, 14 Fla. 587 (Fla. 1874).
This case necessarily resolves itself into four cardinal areas of inquiry: (I) What constitutes a lottery under Article III, Section 23 of the Constitution of 1885? (II) Is Bingo a lottery? (III) What have other jurisdictions, all having similar lottery prohibitions, held regarding the status of Bingo as a lottery? (IV) Are there any factors which might remove Bingo from our constitutional lottery prohibition? These questions will be treated successively.

(I) What constitutes a lottery under Article III, Section 23?

Lotteries have been proscribed by the organic law of Florida since 1868. Fla. Const. Art. I, § 7 (1968); Fla. Const. Art. III, § 23 (1885); Fla. Const. Art. IV, § 20 (1868). However, neither the organic prohibitions, nor their statutory counterparts, have included definitions of the term.
Lottery is a term which has no precise technical meaning, but which traditionally has been defined as a scheme whereby, for consideration, a participant has an opportunity, *675 which is to be determined by chance through the selection of lots, for gaining a prize greater than his consideration. Black's Law Dictionary 1097 (4th ed. 1951); 3 W. Burdick, Law of Crime, § 932 (1946); 3 F. Wharton, Criminal Law & Procedure § 932 (Anderson ed. 1957); 54 C.J.S. Lotteries § 2 (1948); 38 Am.Jur. Gambling §§ 5-9 (1968); 14 Fla.Jur. Gambling § 12 (1957). Florida cases have consistently approved this basic definition of a lottery, although some cases have held that satisfaction of this definition is not the sole basis for determining whether a lottery exists. Our research indicates that altogether, three possible interpretations of what constitutes a lottery have been advanced by this Court.
All three interpretations accept the traditional definition of a lottery as being a scheme involving consideration, random selection, and a prize, but two interpretations envision an additional requirement, either franchise by the government, or widespread effect. We now review these interpretations.
The logical point of departure for any review is the case of Lee v. City of Miami, 121 Fla. 93, 163 So. 486 (1935). The Lee case involved the constitutionality of Ch. 17257, Laws of Fla. 1935, which provided for the licensing and regulation of coin-operated vending and amusement machines that included premium features, i.e., "slot machines". Certain citizens of Miami obtained an injunction restraining the State Comptroller and other public officials from putting the Act into effect, primarily upon the contention that the Act violated the lottery prohibition of Article III, Section 23, of the State Constitution. Upon appeal, this Court reversed through a majority opinion rendered by Justice Terrell.
Justice Terrell took the view that the organic lottery prohibition arose from a particular historical context and that it had to be interpreted in light of that context. He observed that in the early Nineteenth Century, State Legislatures, including Florida's, had looked upon the chartering of lotteries as a convenient fund-raising device for public improvements, the erection of public buildings and for various educational and charitable endeavors. He further observed that unscrupulous operators subverted these charters for their own enrichment with such fervor and frequency that indignant citizens throughout this State and the nation demanded constitutional prohibitions. Constitutional status was desired because only a constitutional prohibition could guarantee that a Legislature would be powerless to franchise lottery schemes.
In the words of Justice Terrell, 121 Fla. 99, 103, 163 So. 489, 490:
"The form of lottery against which popular indignation was directed had its peculiar implications. The legislature would first grant a charter to a lottery company for a period of years in consideration of a stipulated sum in cash, annual payment of further sum, and a percentage of the receipts from the sale of tickets. Under such a charter the company was authorized to sell tickets, or certificates of subscription to issue receipts therefor, and to contract with agents to sell them on commission or otherwise. * * * Under these charters lottery companies devised every scheme and device to ensnare the public, regardless of age, class, or station. Through them the gambling, cheating spirit became dominant and their baneful influence spread like a plague throughout the country.
"It was such lotteries as these that the Supreme Court of the United States was concerned with in Phalen v. Virginia, 8 How. (U.S.) 163, 168, 12 L.Ed. 1030, when it said:
`Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the wide-spread pestilence of lotteries. The former are confined to a few persons and places *676 but the latter infests the whole community: it enters every dwelling; it reaches every class; it prays upon the hard earnings of the poor; and it plunders the ignorant and the simple.'"
* * * * * *
"Our constitutional provision suppressing lotteries does not attempt to define them, but, in view of the prevailing conditions as supported by contemporaneous and subsequent history, we must conclude that the people of this state had in mind such a lottery as was referred to in Phalen v. Virginia, supra."
The language of Justice Terrell which has been set out thus far constitutes one of the three interpretations of our lottery prohibition appearing in our case law. Simply put, this interpretation is that the prohibition is one directed against the Legislature, forbidding that body from promulgating any legislative enactment which would sanction a lottery enterprise, even one for a charitable purpose. This view is supported, incidently, by a reading of the Journal of the Proceedings of the Constitutional Convention of 1885, wherein, at page 163, it is reported that the Convention voted down the following proposed substitute for the lottery prohibition:
"That the Legislature, by a two-thirds vote, to be approved by a majority vote of the entire vote of the qualified electors of the State, may grant a corporate franchise for any lottery or lotteries; provided that 20 per cent. of their net earnings be applied to the common school fund, and for charitable purposes."
We come now to the second interpretation. Justice Terrell did not stop after saying that "[W]e must conclude that the people of this state had in mind such a lottery as was referred to in Phalen v. Virginia, supra." He then went on to say, oddly enough, that:
"What Section 23 actually did was to suppress such legalized lotteries as are referred to in the forepart of this opinion, the primary test of which was whether or not the vice of it infected the whole community or country, rather than individual units of it. Any gambling device reaching such proportions would amount to a violation of the Constitution, but it is not alleged or shown that the devices legalized by Chapter 17257 come in this class. * * * It may be that some of them or possibly all of them in their operation will become such; but we leave that question to be determined when a specific case arises." 121 Fla. at 103, 163 So. at 490.
Later on in the same term, this Court interpreted its holding in Lee in another slot machine case, Hardison v. Coleman, in the following manner, 121 Fla. 892, 900, 164 So. 520, 524 (1935):
"In the able briefs submitted in this case in behalf of respondent we discover no argument which induces this Court to recede from the view expressed in the Lee, Comptroller, Case, supra. In that case the Court places its interpretation upon the word `lotteries,' as used in the Constitution, and limits the meaning of the word as there used to such gambling devices or methods which because of their wide or extensive operation a whole community or country comes within its contaminating influence; a scheme having the elements of advertising or sale to any individual of tickets and public distribution and division of prizes according to the numbers upon a ticket previously sold which entitled the owner to participate in a drawing or distribution of prizes to be made at a date in the future."
Thus we are met with a curious paradox. In the forepart of the Lee opinion, Justice Terrell stressed that the people's indignation was focused upon the franchised lottery in vogue in all States in the Nineteenth Century. Phalen v. Virginia, supra, is given as an explicit example of "what was in the people's minds" when they adopted the lottery prohibition. Phalen, it should be recalled, involved a lottery charter granted to a Virginia company by *677 the legislature of that State for the purpose of funding the construction of a turnpike. Our Legislature had granted similar charters. See, for example, Acts of Florida, 1828, pp. 279-280, entitled, "An Act to incorporate an Academy in Jackson County to be named the Union Academy," wherein the trustees of the Academy were "[H]ereby authorized to raise a sum not exceeding one thousand dollars by way of lottery, upon such schemes as they may devise at their discretion * * *." See also, Acts of Florida, 1828, pp. 280-283, entitled, "An Act to incorporate a company to be called the Ocklocknee and Lake Jackson Canal and Navigation Company," wherein officers of the Company were given the authority "[T]o sell a scheme of a lottery, in one or more schemes under such limitations and provisions as they may determine on in their bye [sic] laws, so that the neat [sic] proceeds of said lottery shall not exceed fifty thousand dollars."
Yet, having said these things in the forepart of his opinion, Justice Terrell went on to embrace an entirely different approach in the latter part of his opinion. "The primary test," he said, referring to what the people sought to suppress, "was whether or not the vice of it infected the whole community or country, rather than individual units of it." 121 Fla. at 103, 163 So. at 490. "Any gambling device," he then said, "reaching such proportions would amount to a violation of the Constitution * * *." (Emphasis supplied.) He then went on to conclude,
"Chapter 17257 on its face does not clearly offend against organic law, nor do the coin-operating vending machines described in Section 2, the use of which is restrained, constitute lotteries per se. It may be that some of them, or possibly all of them in their operation, will become such; but we leave that question to be determined when a specific case arises."
And so, the paradox: it is difficult to comprehend how the people of this State could, at one and the same time, seek to prohibit only the chartered lotteries in vogue in the Nineteenth Century, and yet also "any gambling device" which reached widespread usage. This inconsistency is even more apparent when one reads all of Lee and then reads the summary of the Lee decision as presented in Hardison v. Coleman, supra. In any event, these two decisions give rise to two of the three lottery prohibition interpretations advanced in our case law: (1) A lottery [under Lee] is a scheme involving consideration, random selection, a prize and authorization by the Legislature; or, (2) A lottery [under Lee and Hardison] is a scheme involving consideration, random selection, a prize and widespread operation.
Now to the third interpretation. Four years after Lee and Hardison again considered what constituted a lottery in a per curiam decision in the case of Little River Theatre Corp. v. State, 135 Fla. 854, 185 So. 855 (1939). The proposition under consideration was whether Bank Nights schemes violated Comp.Gen.Laws 1927, §§ 7667 and 7669, predecessors of Fla.Stats. §§ 849.09 and 849.11, F.S.A., which prohibited, respectively, the setting up of lotteries and their operation.
The Court observed, "It becomes pertinent to determine, in consideration of the statutes, supra, what is meant by a lottery." Numerous decisions from sister states were then discussed with primary emphasis upon those which stressed the traditional threefold lottery test. At the conclusion of this review, the Court held that: "The authorities are in accord that a lottery has three elements: first, a prize; second, an award by chance; and, third, a consideration." 135 Fla. at 868, 185 So. at 861. The facts of the case were then analyzed exclusively in the context of the traditional test:
"The facts admit that the prizes run from $50.00 to $500.00 and are actually given away. The winner can obtain the award without a ticket but is required to sign a book when a number is assigned *678 to his name. The second essential being an award by chance. The facts show that on `Bank Night' when a drawing is had numbers corresponding to the names of persons so registered are placed in a drum on the stage of the theater, when the drum containing the names is spun and a blindfolded child selects a number therefrom, when the registration list is consulted and the name having the number as selected by the child is declared the winner, and is awarded the prize. * * * The third essential being consideration [is greater than when the game is not played] * * *. Bank Night advertises the theatre, increases the attendance, and the receipts show a material enhancement. * * * We therefore hold that the Bank Night methods as disclosed by the admitted statement of facts is a lottery and prohibited by the statutes, supra."
The reason why it is said that Little River presents a third interpretation of what constitutes a lottery is that while Lee and Hardison recognize the threefold test set out in Little River, they append to this test additional criteria, either legislative franchise or widespread effect. What was said in Little River, of course, was not new. Thirty-seven years prior to Lee and Hardison, this Court expressly approved in Bueno v. State, 40 Fla. 160, 163, 23 So. 862, 863 (1898) a trial court instruction that: "A lottery is a gaming contract, by which, for a valuable consideration, one may, by favor of the lot, obtain a prize of a value superior to the amount of that which he risks." This, of course, is the classic definition of a lottery. This definition was again approved in D'Alessandro v. State, 114 Fla. 70, 153 So. 95 (1934), the year before Lee.
While not strictly essential for the disposition of this case, this Court ought to lay at rest at this time any question as to the proper interpretation of what constitutes a lottery within the contemplation of Article IV, Section 23, of the Constitution of 1885. As noted earlier, we recognized in Bueno v. State, supra, that a lottery is a scheme whereby, for a valuable consideration, one may, by favor of chance, obtain a prize of a value superior to the amount of that which he risks. When the Court appended other criteria in Lee, Justice Buford set out a lengthy partial dissent disputing the Court's departure from the traditional threefold test. He said, in part, 121 Fla. 93, 111, 163 So. 486, 493:
"There is no ambiguity in our constitutional provision prohibiting lotteries and we know of no rule of construction which will permit us to determine that the intent of the Constitution is that the section should apply to certain classes of lotteries and not to others. It may have been that the framers of the Constitution had in mind a particular kind of lottery when they adopted this provision.
"It occurs to me that the definition given by the Supreme Court of Michigan in the case of People v. Elliott, supra [74 Mich. 264, 41 N.W. 916], is a clear, concise and logical definition of `lottery' which should be applied in determining what is meant by this section of our Constitution; that is:
"`A lottery is a scheme by which a result is reached by some action or means taken in which result man's choice or will has no part, nor can human reason, foresight, sagacity, or design enable him to know or determine such result until the same has been accomplished.'"
Other jurisdictions having constitutional lottery prohibition similar to ours have rejected narrow historical interpretations. See State v. Coats, 158 Or. 122, 74 P.2d 1102 (1938), wherein the Supreme Court of Oregon held:
"No doubt this feature [widespread abuse of charter lotteries] gave rise to prohibitory legislation against the operation of lotteries, but, in our opinion, a scheme or device may constitute a lottery *679 even though it does not amount to a `widespread pestilence'".
And see State ex rel. Evans v. Brotherhood of Friends, 41 Wash.2d 133, 145-148, 247 P.2d 787, 794-796 (1952) wherein it was said:
"However, we cannot agree with appellant's contention that Art. II, § 24, of our state constitution applies only to chartered or ticket lotteries. In the first place, we feel most strongly that the language of this constitutional provision is not ambiguous. The provision is phrased in the broadest and most sweeping terms. It prohibits any lottery. We believe that the word `any', given its usual meaning, is all embracing as far as different types and kinds of lottery schemes and devices are concerned. Clearly, its meaning seems to us to be the equivalent of the terms all or every. It is a cardinal principle of judicial review and interpretation that unambiguous statutes and constitutional provisions are not subject to interpretation and construction."
* * * * * *
"If the framers of our Constitution intended to prohibit only chartered or ticket lotteries, it would have been a very simple matter to have said so in so many words, limiting the prohibition precisely to chartered or ticket lotteries. Quite obviously, they did not do so."
* * * * * *
"While charter or ticket lotteries constituted a widespread evil  and the draftsmen may have had such clearly in mind  other types and kinds of lotteries did exist in 1889, and prior thereto. As a matter of fact, the courts of this country had been confronted with numerous types of lottery other than the chartered or ticket lotteries prior to the time Art. II, § 24, was drafted and adopted. Negley v. Devlin, N.Y. 1872, 12 Abb. Prac., N.S., 210, concert hall, similar to theatre `bank night'; Hull v. Ruggles, 56 N.Y. 424 (1874), gift enterprise conducted with merchandise; Crews v. State, 1871, 38 Ind. 28, distribution of prizes by sale of envelopes; Chavannah v. State, 1873, 49 Ala. 396, wheel of fortune; State v. Clarke, 1856, 33 N.H. 329, 66 Am.Dec. 723, gift sale of books; Holoman v. State, 1877, 2 Tex. App. 610, prizes in candy boxes."
Furthermore, as far as the requirement of "widespread effect" is concerned, this is not a logical basis for determining whether a scheme is a lottery or not. It is saying, in effect, that a lottery drawing or event would not offend against the constitution so long as the scope of the lottery and the number of participants are limited. This is not what the people envisioned. The first session of the Legislature to meet under the Constitution of 1868, which was the first Constitution to prohibit lotteries, enacted under Chapter X, entitled "Of Offenses Against Public Policy," Sections 1 through 6 which made it an offense to conduct any lottery at any place at any time. In Jarrell v. State, 135 Fla. 736, 743, 185 So. 873, 877 (1939) this Court said that our statutes were drafted "[T]o effectuate the provision of the constitution that: `Lotteries are hereby prohibited in this State' * * *;" and that: "The constitution and the statute[s] express a fixed policy of the State and are designed to make a lottery of any kind unlawful; and to impose punishment upon any one who in any way violates the statutes on the subject."
One secondary authority has suggested that there is a distinction between Lee and Little River in that the former discussed the constitutional meaning of lottery, while the latter discussed the statutory meaning of lottery. See 15 Fla.Jur. Gambling, § 12 at 106 (1957). This distinction is untenable. A few weeks before the filing of the Little River decision, the Court said in Jarrell v. State, supra, which we again quote from, that the purpose of these *680 anti-lottery statutes (which were subsequently construed in Little River) was:
"[T]o effectuate the provision of the constitution that: `Lotteries are hereby prohibited in this State'; and the courts should interpret and apply the command of the constitution, when such enforcement does not violate any other provision of the constitution. * * * The constitution and the statute[s] express a fixed policy of the State and are designed to make lottery of any kind unlawful; and to impose punishment upon any one who in any way violates the statutes on the subject." 135 Fla. at 743, 185 So. at 877.
Moreover, in State v. Vasquez, 49 Fla. 126, 38 So. 830 (1905), when the argument was made that a statute licensing penny-operated machines (for dispensing weight, chewing gum and the like) impliedly licensed a slot machine offering the potential of a $2.00 return for a nickel, this Court said that the implication was untenable, "Especially * * * in this state, whose Constitution expressly provides (section 23, art. 3), `Lotteries are hereby prohibited in this state.'" In the headnotes prepared by the Court in Vasquez, it was said that, "A statute licensing [gum ball machines, etc.] under a Constitution prohibiting lotteries, will not be construed to license the operation of a machine in which the element of chance largely predominates." And in Victor v. State, 141 Fla. 508, 193 So. 762 (1940), this Court said in reference to a lottery prohibited by a certain statute that: "It is a lottery within the constitutional prohibition."
The most logical conclusion, considering all the cases, is that while manipulation of legislatively franchised lotteries may have given rise to the prohibition found in our Constitution, the primary concern of the people was with the deleterious effects of any scheme involving consideration, selection of a winner by random chance, and a prize, whether occurring throughout the State or in a single neighborhood. Our lottery prohibition, therefore, should embrace any such scheme. See Blackburn v. Ippolito, 156 So.2d 550 (2nd D.C.A.Fla. 1963); M. Lippincott Mortgage Inv. Co. v. Childress, 204 So.2d 919 (1st D.C.A.Fla. 1967); 16 F.L.P. Lotteries § 3 (1961); 9 Fla.Enc.Dig. Lotteries § 1 (1968); 15 Fla.Jur. Gambling 212 (1957); Wills, Criminal Law & Practice, 1965 Survey of Fla.Law, 20 U.Miami L.Rev. 246, 274 (1965); and, Gaines, Criminal Law: Florida's Legal Lotteries, 9 U.Fla.L.Rev. 93 (1955). The Attorney General has consistently recognized this approach. Op. Atty.Gen.Fla. 064-42 (1964); Op.Atty.Gen. Fla. 061-5 (1961); Op.Atty.Gen.Fla. 060-76 (1960); Op.Atty.Gen.Fla. 058-266 (1958); Op.Atty.Gen.Fla. 057-170 (1957): Op.Atty.Gen.Fla. 049-579 (1949).

(II). Is Bingo a lottery?

In 1967 when the Legislature enacted F.S. § 849.093, F.S.A., this Court had not yet had occasion to expressly clarify the precise meaning of our constitutional lottery prohibition. Therefore, the Legislature had available to it all three of the interpretations advanced in our case law. In such a situation, where a constitutional provision may well have one of several meanings, it is a fundamental rule of constitutional construction that, if the Legislature has by statute adopted one, its action in this respect is considered well-nigh, if not completely, controlling.
It is, therefore, incumbent upon this Court to consider if F.S. § 849.093, F.S.A., would be constitutional under any prevailing interpretation. Since all three interpretations have the traditional threefold lottery test of consideration, random selection by chance, and a prize as their least common denominator, we will first analyze the game in light of this test.
In the forepart of this opinion, we set out appellant's own description of the game. Referring back to that description, we find that participants "pay Appellant a sum of money for the use of one or more cards" *681 upon which are printed twenty-five squares, each containing a number except for the central square which is blank. No participant can obtain a card without paying money for it. Payment of money for the card constitutes consideration without a doubt.
When the game commences, "numbers are drawn by chance from a receptacle, one by one and announced." Such receptacles revolve around tumbling the contents continually to guarantee that those numbers drawn out are the product of pure chance. This is a classic example of "random selection by chance." The receptacle continues rotating, and the numbers are continually withdrawn at random until a participant announces that he has matched up on his pre-numbered purchased card enough randomly drawn numbers to complete the desired winning pattern of numbers. At this time, according to appellant, the participant "calls out `bingo' and is declared the winner of a predetermined cash sum of money." This, of course, is a prize.
It cannot be disputed that this game satisfied the traditional lottery definition. Appellant has never contended otherwise, but instead has argued that satisfaction of this test is not enough, so long as Lee and Hardison are ruling case law. We now examine the game in light of what was said in those cases.
Under the first interpretation offered in Lee, it was said that the people adopted the lottery prohibition to prevent legislative enfranchisement of lottery schemes. Earlier in this opinion, we set out two typical lottery franchises enacted by our Legislature, the Act to incorporate Union Academy, and the Act to incorporate the Canal and Navigation Company. The first Act authorized the trustees of the Academy to raise money by way of a lottery "upon such schemes as they may devise at their discretion." In the second Act, the officers of the Company were authorized to "sell a scheme of lottery, in one or more schemes under such limitations and provisions as they may determine on in their bye [sic] laws." Both Acts authorized lotteries to be conducted solely for beneficial purposes, one for education, the other for improving commerce in the West Florida frontier. The only difference between these two franchises and the franchise given to worthy organizations under F.S. § 849.093, F.S.A., to operate Bingo for specified humanitarian purposes is that the Academy and the Company were allowed to use any scheme of lottery they chose to devise, whereas under F.S. § 849.093, F.S.A., the Legislature has directed that a specific scheme of lottery be utilized. Our Constitution, according to the first interpretation given in Lee, would prohibit both the Acts and the statute.
In the latter portion of Lee and in Hardison, this Court said that in order to constitute a lottery one must have a scheme involving consideration, random selection by chance, and a prize which is of such widespread operation as to be prevalent throughout an entire country or community. In 3 Encyclopedia International Bingo 17 (1963), Bingo is described as "one of the most popular games of pure chance played in the United States." Justice Buford wrote a lengthy special concurrence in Creash v. State, 131 Fla. 111, 122, 179 So. 149, 153 (1938) devoted to describing the game's popularity. In Florida Legislative Council, Bingo Sub-Committee, Committee on Scope and Function, Study of Operations Under Florida Bingo Law and Recommendations for Amendment (December, 1967), cited by appellee, several pages are devoted to a discussion of the game's widespread popularity in Dade, Broward and Pinellas Counties. Passage of F.S. § 849.093, F.S.A., itself demonstrates that the game enjoys a widespread following. It cannot be denied that the game was sufficiently prevalent throughout Florida prior to the passage of F.S. § 849.093, F.S.A., to satisfy the widespread operation test of Lee and Hardison and thus constitute a lottery.
*682 Moreover, numerous opinions of Florida's Attorney General have consistently labeled Bingo as a lottery. Op.Atty.Gen. Fla. 061-6 (1961) (Chamber of Commerce warned that proposed Bingo game would be a lottery if consideration present); Op. Atty.Gen.Fla. 057-363 (1957) (Bingo game sponsored by theater would be lottery); Op.Atty.Gen.Fla. 056-272 (1956) (Bingo played by private club was a lottery); Op.Atty.Gen.Fla. 053-59 (1953) (Community Center could not sponsor Bingo because a lottery); Op.Atty.Gen.Fla. 052-289 (1952) (Hotel's Bingo game constituted a lottery); Op.Atty.Gen.Fla. 049-519 (1949) (Bingo game operated by restaurant and liquor store would be lottery if award of prize was made by chance).
Bingo's status as a lottery was even recognized in the Florida Legislative Council and Legislative Reference Bureau's study of Bingo operations under F.S. § 849.093, F.S.A., supra, prepared for the Florida Legislature's Bingo Sub-Committee in December 1967. At page 5, under the heading "Shortcomings of Florida Bingo Legislation," the Council stated that: "Bingo is purely and simply a lottery. The present law has been labeled by law enforcement officers and state attorneys as unenforceable." (Emphasis supplied.)
We have reviewed the game of Bingo under every interpretation of a lottery extant in our jurisprudence and available to the Legislature in 1967. Under every interpretation, the game constitutes a lottery.

(III). What have other jurisdictions, all having similar constitutional lottery prohibitions, held regarding the status of Bingo as a lottery?

Because of Bingo's widespread appeal, the question litigated here has arisen many times before in other jurisdictions having similar organic lottery bans. The game has uniformly been recognized as a lottery and prohibited as such. Idea Research and Development Corp. v. Hultman, 256 Iowa 1381, 131 N.W.2d 496 (1964); State v. Mabrey, 245 Iowa 428, 60 N.W.2d 889 (1953); A.B. Long Music Co. v. Commonwealth, 429 S.W.2d 391 (Ky. 1968); Nadlin v. Starick, 92 Ohio Law Abst. 35, 194 N.E.2d 81 (C.P.Ohio 1963); Wishing Well Club v. City of Akron, 66 Ohio Law Abst. 406, 112 N.E.2d 41 (C.P.Ohio 1951); Loder v. City of Canton, 65 Ohio Law Abst. 517, 111 N.E.2d 793 (C.P.Ohio 1951); Commonwealth v. O'Connell, 293 Mass. 459, 200 N.E. 269 (1936); Society of Good Neighbors v. Van Antwerp, 324 Mich. 22, 36 N.W.2d 308 (1949); United-Detroit Theaters Corp. v. Colonial Theatrical Enterprise, 280 Mich. 425, 273 N.W. 756 (1937); People v. Welch, 269 Mich. 449, 257 N.W. 859 (1934); Cotroneo v. Townsend, 111 N.Y.S.2d 491 (Sup.Ct. 1952); People v. Kiefer, 173 Misc. 300, 16 N.Y.S.2d 858 (Co.Ct. 1940); People on Complaint of Golden v. Rind, 46 N.Y.S.2d 723 (New Rochelle City Ct. 1944); State v. Socony Mobil Oil Co., 386 S.W.2d 169 (Tex.Civ. App. 1964); Hoffman v. State, 219 S.W.2d 539 (Tex.Civ.App. 1949); State v. Laven, 270 Wis. 524, 71 N.W.2d 287 (1955); State ex rel. Trampe v. Multerer, 234 Wis. 50, 289 N.W. 600 (1940); cf. People v. Rosen, 11 Cal.2d 147, 78 P.2d 727 (1938).
Our research has led us to only one case holding that Bingo was not a lottery under a constitutional lottery prohibition. In Bender v. Arundel Arena, Inc., 248 Md. 181, 236 A.2d 7 (Ct.App. 1967), it was held that even though most states held Bingo to be a lottery, Maryland did not because while other state constitutions referred to "lottery" in a generic sense, Maryland's constitutional history indicated that her constitutional prohibition was drafted in a particular technical sense so as to prohibit only lotteries chartered by the Maryland Legislature. This, of course, is not the case in Florida where our prohibition has always been considered generic.
Secondary authorities of both a legal and a general nature agree that Bingo is a lottery. 54 C.J.S. Lotteries § 10 (1948) ("Although there is some authority to the contrary, it is generally held that the game variously designated as `bingo,' `beano,' *683 `lotto,' or the like is a lottery."); 3 Wharton, Criminal Law & Procedure § 942 (Anderson ed. 1957) ("Bingo and Keno are lotteries"); 3 Encyclopedia Britannica Bingo 582 (1961) ("Bingo, a lottery game played in many variants and under several names * * * Latin Americans play a similar game called bolito."); 3 Encyclopedia Americana Bingo 755 (1969) ("A popular lottery pastime at fairs, carnivals and fund-raising events"). See also J. Ezell, Fortune's Merry Wheel: The Lottery in America (1960) at pp. 276-81, wherein the game is discussed as a "legal lottery."
In the United Kingdom, where Bingo is much a national pastime, the game is recognized by law as a lottery and licensed as such. The game has been embraced by a continuing series of lottery legislation since 1934, including the Betting & Lotteries Act, 1934, 24 & 25 Geo. 5, c. 58; Small Lotteries & Gaming Act, 1956, 4 & 5 Eliz. 2, c. 45; Betting & Gaming Act, 8 & 9 Eliz. 2., c. 60; and Betting, Gaming & Lotteries Act, 1963, c. 2, sched. 7. See 18 Halsbury, Laws of England, Lotteries §§ 460-74 (Simonds ed. 1957) for discussion of lotteries under these acts.
A detailed discussion of Bingo under the above acts appears in The Bingo Bungle, 105 Sol.J. 597 (July 14, 1961), wherein the author expresses the opinion that "Quite clearly bingo is a lottery," and goes on to say:
"The distinction betwen lotteries and gaming is by no means a hard and fast one, but participation in the game of bingo is not confined to a payment for a ticket, and the act of marking off on a card the numbers drawn from the bag, and the making of a claim for a prize when the requisite numbers have been drawn, is sufficient to constitute bingo a game of chance. But it is also a distribution of prizes by lot, without the use of skill, and as such it is also a lottery." 105 Sol.J. at 598.

(IV). Are there any factors which might remove Bingo from our constitutional lottery prohibition?

During our consideration of this case after hearing the initial oral argument, several questions were raised which require comment. First, it has been suggested that perhaps Bingo was a game involving skill, and, therefore, not really a lottery. A primary distinction between gambling, which the Legislature can permit, and a lottery, which it has no power to permit, is that the former involves elements of skill and maneuver, while the latter involves only the operation of chance. "Gambling schemes where winning depends on skill or judgment are not like a lottery in which success is determined by pure chance and is thus specially attractive to the inexperienced and the ignorant," Boasberg v. United States, (5th Cir.1932), 60 F.2d 185, cert. den. 287 U.S. 664, 53 S.Ct. 221, 77 L.Ed. 573. A lottery is `a scheme by which a result is reached by some action or means taken, in which result man's choice or will has no part, nor can human reason * * * sagacity or design enable him to know or determine * * * until the same has been accomplished,' Peek v. United States, 61 F.2d 973 (5th Cir.1932). In Danks, How to Run a Lottery, Crim.L.Rev. 1957, 586-600, it is said that: "To constitute a lottery it must be a matter depending entirely on chance; if merit or skill plays any part in determining the distribution there has been no lottery. The merit or skill must be real skill, something more than a scintilla of skill, which has some effect."
Is there skill in Bingo as operated by appellant? One has no control over the cards one receives. The selection of those numbers which are announced is determined solely by random chance. One cannot win in any way, regardless of how many years one has played at the game, until the announced numbers turn out to form a winning pattern on a pre-numbered purchased card. Where is the "sagacity or design" here? Where is the *684 knowledge of odds and probability that enable one to fare well at a gamble? It is true that some participants are skilled at playing multiple cards concurrently, but the whole cannot be greater than the sum of its parts. Each card played remains a lottery, and still the participant cannot win on any card until random selection produces a winning pattern which cannot be perceived by the participant in advance.
During reargument of this case, the question was repeatedly raised from the Bench whether any element of skill was involved in appellant's games. In response to these repeated queries, appellant's attorney consistently replied that the game was absolutely one of chance and that no skill was involved. Discussions and definitions of the game always state that it is a game of chance. See, e.g., the definition of "Bingo" appearing in Ballentine Law Dictionary (3rd ed. 1969); also 3 Encyclopedia International Bingo 17 (1963), wherein A.A. Ostrow, Games Authority of the Association of American Playing Cards, states that Bingo is "[O]ne of the most popular games of pure chance played in the United States." (Emphasis supplied.) It should be clear, therefore, that the game as played by appellant offers no element of skill which would remove it from the lottery category.
The second point requiring comment is a very interesting one. Prior to their second appearance here for reargument, counsel for both litigants were officially informed that the Court desired that attention be given to this question: "Is the game of bingo a pari-mutuel pool authorized by law as of the effective date of the 1968 Constitution within the purview of Article X, Section 7, 1968 Constitution?"
It should be immediately borne in mind that the statute in question was enacted in 1967. Final summary judgment declaring F.S. § 849.093, F.S.A. unconstitutional and void was entered by Circuit Judge Luckie on October 15, 1968, which was prior to the time when the proposed 1968 Constitution was on the ballot. This Constitution did not become effective until January 7, 1969. Thus if F.S. § 849.093, F.S.A. was unconstitutional under the 1885 Constitution, it did not survive to see the birth of the new Constitution, and the new Constitution could not reach back to bring the statute to life again.
Literally, pari-mutuel is defined as a "mutual stake or wager; a betting pool." Any gambling scheme at all, be it a lottery or a game of cards played for money, would satisfy the literal definition of this word because all that is literally required is that two or more persons place wagers on some event. See D'Alessandro v. State, 114 Fla. 70, 153 So. 95 (1934), wherein it is said that a lottery constitutes a pool.
In legal usage, however, the term "authorized pari mutuel pool" has taken on a certain, precise and restricted meaning because of historical developments. J.O. Humphreys notes in his definitive work Racing Law (1963) that historically even though every form of mutuel wager has been outlawed as gambling, mutuel wagering on competitive racing events has consistently received special favor and has been classed as an exception to the rule. Over the past two hundred years of English and American history, official tolerance of wagering generally has declined progressively, whereas mutuel wagering at the track has been considered as a thing apart. While all states prohibit lotteries and gambling to some extent, by 1963 twenty-eight states, including Florida, had sanctioned restricted pari-mutuel wagering at race tracks for the two-fold purpose of strictly controlling the traditional betting and garnering revenue for the State. In each of these states, pari-mutuel betting is limited to the track, and is supervised by a state racing commission, and all other mutuel wagering is prohibited as gambling. The commissions deduct percentages of all the pooled bets registered by participants within specified locations at the various sites of competition for the state, and the balance is distributed to the *685 winning bettors. This is what has become known as authorized pari-mutuel pool betting. See generally Racing Law, supra; Florida Legislative Council, Racing and the Pari-Mutuel Industry in Florida (1965); 38 Am.Jur.2d Gambling § 47 (1957). It is a specifically authorized exception to the general prohibition on gambling.
Our State's history presents an excellent example of how this specific exception developed. Under Florida's earliest gambling laws, horse racing was expressly exempted from the general prohibition against gambling. However, by the 1870's horse racing was prohibited as an offense against public policy. Then in 1891 the Legislature enacted Chapter 4023, Laws of Florida, entitled, "An Act to Authorize and Regulate the Selling of pools in this State." This chapter made it an offense for any person or persons to engage in pari-mutuel pooling at any time or place except:
"That all associations for the purpose of driving, racing, or otherwise improving the speed and breed of horses, which shall, or may hereafter be incorporated, under the laws of this State, are hereby authorized and allowed the privilege of selling pools; but no pool-selling shall take place, except between the first day of November and the first day of May in each and every year, and all pool-selling shall be confined to the track, and on days only on which the races take place."
The Chapter further required that a percentage of the betting receipts were to be paid to the State, and that all such moneys were to become part of the State school fund. Reports were to be filed with the Comptroller. Anyone engaging in pari-mutuel betting not connected with authorized track betting was deemed to be committing a misdemeanor. See McBride v. State, 39 Fla. 442, 22 So. 711 (1897).
In 1909 the above Chapter was repealed by Chapter 5959, Laws of Florida, which declared that again all betting or wagering upon the result of any trial or contest of skill, speed, or power of endurance of man or beast was against the law.
In 1927, in Reinmiller v. State, 93 Fla. 462, 111 So. 633, this Court dealt with the case of a man who was operating a race track and conducting a pari-mutuel pool in Jacksonville. We held that though there were no laws prohibiting operation of a race-track, it was an offense under Chapter 5959, supra, to engage in wagering on races and events of endurance.
Pompano Horse Club v. State, 93 Fla. 415, 111 So. 801 (1927), was filed the same day as Reinmiller, supra. Pompano involved basically the same situation as Reinmiller. A suit for an injunction was granted against the Horse Club as a public nuisance because operators of the Club and others conducted a pari-mutuel pool at the track. This Court affirmed the injunction, not because a race track was involved, but because operation of the pari-mutuel pool was against the law since repeal of the 1909 Act, supra. The Court said, 93 Fla. at 446, 111 So. at 812:
"We are not concerned, primarily, with the matter of horse racing. The question before us is whether or not the buying, selling, and redeeming of certificates, in the manner and for the purpose stated, constitutes gambling, or a game of chance. Regardless of whether horse racing, within itself, is a `game' or a `sport,' or, if a game, whether it be one of `skill' or of `chance'  when a group of persons, each of whom has contributed money to a common fund and received a ticket or certificate representing such contribution, adopt a horse race, the result of which is uncertain, as a means of determining, by chance, which members of the group have won and which have lost upon a redivision of that fund, each contributor having selected a stated horse to win such race, the redeemable value of the certificates so obtained and held by the contributors to such fund being varied or affected by *686 the result of such race, so that the value of some is enhanced, while that of others is reduced or destroyed, the original purchase price of all having been the same, those who chose the winning horses being paid from the fund so accumulated more than they contributed thereto, by dividing amongst them the money contributed by those who chose losing horses and who therefore received nothing, that process becomes a `game of chance,' and those who buy, sell, or redeem such certificates, for the purposes and in the manner hereinabove stated, are `engaged' in such game within the contemplation of section 5639, supra. In the plan before us, the corporate appellant is a custodian or depository of money staked, bet, or wagered on the result of a contest of speed between horses and the skill of their jockeys, in violation of section 5514, supra."
Four years after Reinmiller and Pompano were decided, the Legislature once again restored legality to pari-mutuel pools at racetracks only by passage of Chapter 14832, Laws of Florida 1931. This Chapter established a state-wide Racing Commission which had the power to license racetracks subject to certain limitations, and to control racing throughout the State. Section 16 provided: "Within the enclosure of any race meeting licensed and conducted under this Act, but not elsewhere, the sale of pari mutuel pools under such regulations as the Commission shall prescribe, is hereby authorized and permitted."
In 1935 the Legislature brought Jai-a-lai exhibitions under the authority of the Racing Commission through Chapter 17074, Laws of Florida 1935. Section 7 provided: "Within the enclosure of any Fronton licensed and conducted under this Act, but not elsewhere, wagering on the respective scores or points of the game of Jai-a-lai or Pelota and the sale of Pari-mutuel pools under such regulations as the Commission shall prescribe, are hereby authorized and permitted * * *." (Emphasis supplied.)
Since 1935 there have been a considerable number of amendments to the basic acts on racing and Jai-a-lai, and these acts and their amendments now form Chapters 550 and 551, Florida Statutes. To the present these acts form the basis for the only pari-mutuel pools which we have authorized by law, and all other instances of pari-mutuel wagering in this State are expressly prohibited by F.S. §§ 550.16 and 551.09, F.S.A.
According to the Legislative Council's Report on Racing and the Pari-Mutuel Industry, supra, at page 20, "The need for revenues to finance public services has been the justification for legalized gambling from the beginning." Our authorized pari-mutuel pools have contributed generously to this need; between 1931 and 1964, for example, according to statistics presented in the Council's Report, 133,992,730 people participated in our pools, betting a total amount of $6,023,225,506.00, which resulted in the State receiving $432,425,813.31 in revenue. The impact of this revenue was such that in 1940 Article IX, 1885 Constitution, relating to taxation and finance, was amended as follows:
"Section 15. The Legislature shall have the power to allocate and distribute to the several counties of the State, in equal amounts, and at such times as the Legislature shall determine, any portion of or all excise taxes now levied and collected, or hereafter levied or collected, by the State of Florida from the operation of pari-mutuel pools."
Thus one sees that "authorized pari-mutuel pools" is a term having a specific meaning quite different from the general concept that any mutual wager of any sort is, literally taken, a pari-mutuel pool. The drafters of the 1968 Constitution recognized that this distinction existed, and they preserved it in the new Constitution. The Constitution Revision Commission initially drafted the lottery prohibition to read: "All lotteries are prohibited." The House version changed this to read, "Lotteries are *687 hereby prohibited in this State." But the Senate preferred that the prohibition read, "Lotteries, other than pari-mutuel pools authorized by law as of the effective date of this Constitution, are hereby prohibited in this State." Ultimately, the Senate and the House adopted the Senate version along with an addition of the words, "the types of," suggested by Circuit Judge Taylor, so that the final prohibition adopted by the people in general election read: "Lotteries, other than the types of pari-mutuel pools authorized by law as of the effective date of this constitution, are hereby prohibited in this State." (Emphasis supplied.)
Bingo has never been an authorized pari-mutuel pool as we have consistently recognized that term in Florida. Agreed, it is a pari-mutuel pool in the general sense that a lottery and all other gambling is a pool, but as we have shown this is not the specific type of pool which we have authorized in Florida. The types of pari-mutuel pools which we have authorized are those embraced in Chapters 550 and 551 of our Statutes. F.S. § 849.093, F.S.A., of course, did not appear in those chapters. It appeared in Chapter 849, entitled "Gambling," specifically, within the sections treating with lotteries. Counsel for appellant never suggested that the Legislature considered authorizing Bingo as a pari-mutuel pool. Counsel argued only that the Legislature had enacted F.S. § 849.093, F.S.A., and that the game was literally a "pari-mutuel pool" according to the description of a pool set out in the Pompano Horse Club case, supra, and that, therefore, it was "obviously an authorized pari-mutuel pool." In light of what we have said thus far, it can only be said that this is truly an audacious proposition. The issue of the "Florida Times-Union" appearing the day after re-argument featured the story under the large headline, "State Supreme Court Hears Novel Argument About Bingo." It was indeed novel.
In the landmark case of Valdez v. State ex rel. Farrior, 142 Fla. 123, 194 So. 388 (1940) we specifically rejected the contention that Legislative approval of one form of pari-mutuel wagering impliedly legalized all other types of pari-mutuel wagering. At 142 Fla. 133, 194 So. 393, after a lengthy discussion of this contention, we said:
"A perusal of Chapter 14832, supra, [the 1931 Act] discloses that it authorizes the operation of pari-mutuel pools only under limited conditions and at and in particular places. Therefore, we do not think and cannot hold, that the enactment of the legislature could have the effect of changing the public policy of the State in regard to gaming and gambling and the operation of gambling houses as established by the General Statutes of Florida."
One final point raised at reargument, involving Overby v. State, 18 Fla. 178 (1881), requires comment. Act No. 1, Laws of Florida 1839, made it an offense for anyone to operate a gaming table. In 1879, the Legislature enacted Chapter 3099, relating to the raising of revenues, Section 11 of which provided for the licensing at set fees of various gaming devices including "keno or pool tables, or wheel of fortunes." In 1880 a man named Overby was indicted in Jacksonville and convicted of the offense of operating keno tables prohibited by Act No. 1, Laws 1839. On appeal this Court reversed on the ground that Overby's tables were licensed under Chapter 3099, Laws 1879, and that the licensing act impliedly overruled the 1839 Act prohibiting such tables.
It was suggested at reargument that since keno is very similar to Bingo, and since we recognized the power of the Legislature to authorize keno in Overby, we, therefore, are commanded by precedent to recognize the power of the Legislature to authorize Bingo. We cannot accept this conclusion.
First, we have examined the file in the Overby case and we note that no constitutional issues were presented to the Court. Second, Section 11 of Chapter 3099, Laws 1879, was unlike any other revenue section ever enacted, and it was very short-lived. Virtually every act for assessment and collection *688 of revenue passed by the Legislature in the Nineteenth Century provided for licensing as a source of revenue. But the 1879 Act was the first and only act providing for licensing of "keno or wheels of fortune." Wheels of fortune, of course, were obviously prohibited by the 1868 Constitution's lottery prohibition. See, generally, J. Ezell, Fortune's Merry Wheel: The Lottery in America (1960).
On February 22, three days before this Court announced its decision in Overby, the Legislature struck out Section 11 of the 1879 Act by passage of Chapter 3277, Laws 1881, which again outlawed gaming tables; persons having licenses for these tables were exempted only until expiration of their licenses. When Section 11 of Chapter 3219, Laws of Florida 1881, was drafted as successor to Section 11 of the 1879 revenue act, it was cleansed of any reference to keno or wheels of fortune. Licensing of these lotteries has never been revived.

(V). Conclusion.

The cardinal question is whether the Circuit Judge below was correct in ruling that F.S. § 489.093 F.S.A. is unconstitutional because it violates the lottery prohibition of Article III, Section 23 of the 1885 Constitution. At the time when the statute was passed, three interpretations of our lottery prohibition were extant in our jurisprudence. If under any of these interpretations it could be shown that the game authorized was not a lottery, we would sustain the enactment. Yet we have seen that under any interpretation the game as played by appellant is a lottery. Nor are there any factors which remove the game from the lottery category. It is patently clear that no skill is involved. It is similarly clear that the game is not a pari-mutuel pool authorized by law. Holdings in other jurisdictions, and secondary authorities of both a legal and a general nature, confirm the inexorable conclusion that the game is a lottery which the Legislature had no power to sanction.
Our Legislature has not been the first to run afoul of a constitutional lottery ban. Opinion to House of Representatives, 93 R.I. 463, 176 A.2d 391 (1962); State ex rel. Harrison v. Deniff, 126 Mont. 109, 245 P.2d 140 (1952); State v. Village of Garden City, 74 Idaho 513, 265 P.2d 328 (1953); Commonwealth v. Malco-Memphis Theatres, 293 Ky. 531, 169 S.W.2d 596 (1943); State v. Laven, 270 Wis. 524, 71 N.W.2d 287 (1955). The prime contributing factor to such error is the fatal supposition that a benevolent purpose will cure a fundamental constitutional defect. Many may think that the game played by appellant under authority of F.S. § 849.093, F.S.A., is innocuous, and many may think its lottery aspects are outweighed by its beneficial fund-raising and social aspects, but none of this can cleanse away the fact that it is a lottery. See Op.Atty.Gen.Fla., 053-59 (1953) wherein the Attorney General, advising against a proposed community center Bingo game, said: "It is true that this plan is not for private gain but for community projects. The Constitution, however, bars all types of lotteries. See Article III, Section 23, Florida Constitution."
In view of the lottery prohibition, the proper procedure for the game's advocates to follow would be to secure an amendment to the Constitution through the normal amendatory process, rather than to seek to amend it with legislation, an effort which must always fail. Our research indicates that in at least five states the people have amended their constitutional lottery prohibitions to provide specifically for Bingo. See Colo.Const. Art.XVIII, § 2; Del.Const. Art. II, § 17A; Neb.Const. Art. III, § 24; N.J.Const. Art. IV, § 7(2); and, N.Y.Const. Art. I, § 9(2). The New York amendment is typical and we have set it out in the margin merely because of its similarity to Fla. Stat., § 849.093, F.S.A.[2]
*689 We are not unmindful of the humanitarian reasons which no doubt motivated the Legislature into providing for Bingo as a means for non-profit organizations to fund their charitable, religious, civic, benevolent and scholastic endeavors. Nonetheless, we cannot lay aside, for these or any other considerations, our duty to impartially interpret the provisions of our Constitution according to neutral principles of constitutional law. The late Mr. Justice Mathews clearly enunciated our responsibility in this regard in the case of Volusia County Kennel Club, Inc., v. Haggard, 73 So.2d 884, 898 (Fla. 1854):
"The courts have no power to suspend these constitutional guarantees simply because of the fact that it may be the popular or expedient thing to do with reference to a particular group or situation. It would be a poor substitute, indeed, for our constitutional system of government for the courts ever to adopt a policy of upholding a law which violates constitutional guarantees merely because it may be a popular thing to do as to a particular group or on a given occasion. * * * It seems superfluous to say that a poll to ascertain public opinion should never be the necessary prerequisite to a judicial opinion under our constitutional system for the administration of Justice."
For the reasons stated, I dissent from the majority opinion and would affirm the decision under review.
DREW, J., concurs.
THORNAL, J., concurs with opinion.
THORNAL, Justice (concurring).
I concur completely in the excellent opinion prepared by Mr. Justice Carlton. He has adequately distinguished Lee v. City of Miami, 121 Fla. 93, 163 So. 486 (1935). However, if it were necessary to do so I would be willing to recede from Lee, despite the eminence of its author whose memory we all revere. I thought it was bad law when it was announced and I still think so.
DREW, J., concurs.
NOTES
[1] "849.093 Charitable, non-profit organizations; certain endeavors permitted. (1) None of the provisions of Chapter 849, Florida Statutes, shall be construed to prohibit or prevent non-profit or veterans organizations engaged in charitable, civic, community, benevolent, religious or scholastic works and/or other similar activities, which organizations have been in existence for a period of three (3) years or more from conducting Bingo games or Guest games, provided that the entire proceeds derived from the conduct of such games shall be donated by such organizations to the endeavors mentioned above. In no case shall the proceeds from the conduct of such games be used for any other purpose whatsoever."
[2] N.Y.Const. Art. I, § 9(2):

"Notwithstanding the foregoing provisions of this section, any city, town or village within the state may by an approving vote of the majority of the qualified electors in such municipality voting on a proposition therefor submitted at a general or special election authorize, subject to state legislative supervision and control, the conduct of specific games of chance, commonly known as bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random. If authorized, such games shall be subject to the following restrictions, among others which may be prescribed by the legislature: only bona fide religious, charitable or non-profit organizations of veterans volunteer firemen and similar non-profit organizations shall be permitted to conduct such games; the entire net proceeds of any game shall be exclusively devoted to the lawful purposes of such organizations; no single prize shall exceed two hundred and fifty dollars; no series of prizes on any one occasion shall aggregate more than one thousand dollars; no person except a bona fide member of any such organization shall participate in the management or operation of such game; and no person shall receive any remuneration for participating in the management or operation of any such game. The legislature shall pass appropriate laws to effectuate the purposes of this subdivision, ensure that such games are rigidly regulated to prevent commercialized gambling, prevent participation by criminal and other undesirable elements and the diversion of funds from the purposes authorized hereunder and establish a method by which a municipality which has authorized such games may rescind or revoke such authorization. Unless permitted by the legislature, no municipality shall have the power to pass local laws or ordinances relating to such games. Nothing in this section shall prevent the legislature from passing laws more restrictive than any of the provisions of this section."